Radcliff, J.
The appellant in this cause formerly recovered a judgment in the supreme court against the respondents, which, on a writ of error, was here affirmed. Since that period, the respondents have filed a bill in chancery,, alleging a fraud in the contract for the sale of certain .parcels of cotton and indigo, for the amount or value of which they were held liable by that judgment, and they claim relief On the ground of this fraud. It is unnecessary to be. more particular in stating the. different proceedings on this much litigated controversy, as they are fully in the possession of the court. It will be sufficient to premise, that the present appeal is from an order of the chancellor, by which it was decreed, that the . recovery at law did not preclude the respondents from seeking relief in equity, against the fraud which is alleged ; and which order also confirmed a former-order made in the cause, directing atl issue at law "to try the matter of fraud,
*571 *The first question, therefore, which presents it- [*492] self for our examination, is, whether the recovery at law precluded the relief sought in equity? If it did, the decision of this point will put an end' to the cause ; if not, there are other questions which will remain to be examined.
The general principle, that the judgment or decree of a court possessing competent jurisdiction, shall be final as to the subject matter thereby determined, is conceded on both sides, and can admit of no doubt. The principle, however, extends farther. It is not only final as to the matter actually determined, but as to every other matter which the parties might litigate in the cause, and which they might have had decided.(a) (Prec. in Cha. 221. 3 Atk. 224. 1 Yern. 176. *572 2 H. Black. 414. 7 Term Rep. 269. 2 Cas. iñ Cha. 95. Cha. Rep. 243. 2 Burr. 1009.) The reasons in favor of this *573 extent of the rule, appear to me satisfactory ; they are founded in the expedience and propriety of silencing the conten *574 tions of parties, and of accomplishing the. ends of justice, by a single and speedy decision of all their rights. It is evi *575 dently proper to prescribe some period to controversies of this sort; and what period can be more fit and proper than that which affords a full and fair opportunity to examine and decide all their claims? This extent of the rule can impose no hardship. It requires no more than a reasonable degree of vigilence and attention; a different course might be dangerous, and often oppressive. It might tend to unsettle all the determinations of law, and open a door for infinite vexation.
This reasoning is founded in good sense, and supported by the weight of authority. It is equally applicable to the court of chancery as to any other court. It is true, some an *576 cient precedents have been, and more of them may, perhaps, be.found to oppose this doctrine, but they appear to have originated at a period, when the limits of the respective courts of equity and of law, in England, were imperfectly ascertained, and when the extreme rigor of the latter drove suitors to seek redress from their judgments, in the more liberal conduct of the former. The court of chancery availed itself of this disposition in the courts of law, and assumed an [*493] unlimited power of revising their decisions. *This power was resisted, but without success, ■ till the courts of law relaxed their severity, and adopted more just and liberal principles on almost every subject, and particularly on the subject of granting new trials. Since that period, the boundaries of the different courts have become better established and understood; (1 Atk. 293 ;) and their decisions are mutually respected, as conclusive on the matters over which they exercise jurisdiction. These observations are intended rather to account for some of the ancient cases, (2 Tern. 146, 240, 378, and Countess of Gainsborough's case, at the rolls, Prec. in Cha. 233 ;) which have been produced by the counsel, than as immediately applicable to the question before us. I consider, therefore, the rule in the extent I have mentioned, as firmly established by the modern authorities, and founded in propriety.. If so, the only inquiry, is, "whether the respondents, under the circumstances of this case, would have been admitted to make a defence on the trial at law, on the ground of the fraud which they now allege1? .
It is not to be doubted, but that courts of law and equity have a concurrent jurisdiction on the question of fraud. (3 Black. Com. 431. 2 P. Wms. 156 ; 220. 1 Burr. 396; 480 ; 482. 2 Ves. jun. 295.) Considering the respondents, according to the former decision of this court as completely substituted with regard to the appellant in the place of the purchasers, they became responsible to him to the same extent in which Gomez, Lopez, and Rivera, were liable, by the original contract; it follows that they acquired all the rights of Gomez, Lopez, and Rivera, and, of course, could avail *577 themselves of the same defence. (Park, 303.) We have seen the latter actually making the defence of fraud at law, on the trial of the notes. It was equally competent for the respondents to make that defence, on the trial against them. Whether that defence would apply to the whole action, or to the amount of the damages only, cannot be material, nor can it be considered as a point merely collateral to the issue between the parties. In every action of this sort, the amount of the damages .to be recovered, as well as the right of recovery, is a point immediately in litigation, with respect to which the parties are supposed to be *equal- [#494] ly prepared, and must be equally concluded. To consider the damages as distinct from the right of action, or collateral to it, and on this ground to review the judgment of another court, would destroy the effect of the rule. It often happens that the amount of damages constitutes ■ the principal question between the parties, and in every case, the whole merits of the cause must be re-examined to judge of their propriety; and, thus, in another form, the merits would again become the subject of legal investigation.
It is, however, admitted, that cases in which there are no laches or neglect, form exceptions to the rule. Thus, where a party has no notice of a defence to which he is entitled, orean make it appear, that material evidence has been subsequently discovered, which would probably support that defence, and alter the determination, he ought not to be concluded. But in -these cases, it is incumbent on him to show a reasonable ground to presume that he has not been guilty of negligence, as in the first instance that he was ignorant of his defence, or in case of the discovery of new evidence, that he had used due diligence, and could not obtain it. Without this restriction, it would be in vain to say, that he is ever precluded, for the pretence of new matter or new evidence, when a party is dissatisfied with á former determination, would always be made.
In the present instance, it cannot be pretended, that the respondents had no knowledge of the charge of fraud. If their own testimony is to be credited, their agents, Smith & *578 Atkinson, in London, had notice of the fraud, if any existed, as early as October, 1795, for the property was at that time abandoned to them, on the very principle that there was a fraud in the contract, notice of which must have been conveyed to their principals. But independent of this,, both parties had express notice of the fraud, long before the trial at law. The bill filed by Gomez and Rivera, to which they were parties, together with Lopez, was founded [*495] wholly on this charge. it was,^therefore, complete^ ly within their own knowledge, and for aught that appears, the evidence of the fraud, if any existed, was as completely in their power. If it did exist, the legal presumption "is, that they had the proofs in their power, for a party is never presumed to be ignorant or incapable of evincing the truth of his 'case. If the fact be so, it is incumbent 'on him to show it, in order to excuse the apparent neglect, and support his claim to an exception in his favor. The manner in which it is to be shown must always depend on the particular circumstances of the case. In the present instance, there is no proof, nór any circumstance in my recollection, from which it can be reasonably inferred that the respondents could not, with proper diligence, have possessed themselves, on the trial at law, of the. same evidence they have since offered, and I beliéve it is not even alleged in their bill. Under these circumstances, I think it would- be unsafe and improper, in any court, to open a controversy already determined, on the loóse conjecture,-that they might not have had the evidence in their power.
It has also been urged, that the respondents were surprised by the recovery at law. If they were in -reality surprised, it was not by. a matter of evidence, or a question of fact, but by a-principle of la w which was determined against them.. It would be contrary to first principles, to,admit a mistake or ignorance of the law to excuse a neglect. If the respondents had been surprised by other means, as by artifice practiced by their'adversaries, or by testimony which they could not reasonably be prepared1 tó meet, the case would stand o.n different grounds. It is this kind of surprise only *579 which I apprehend • is considered at law, as material on a motion for a new trial. Such was the case cited from Burrow, [Bright v. Eynou, 1 Burr. 396,) where, in assigning the reasons for a new trial, the court, among other things, say that the attention of the jury had been artfully drawn from the fraud (the principal, point in the cause) to the heinous charge of forgery alone. The verdict of the jury was there traced to the act and management of one *of the parties, and not to any neglect or default of [*496] the other. The fraud was actually in evidence, and the surprise related to the proof of a fact in controversy between the parties. It will also be recollected, -that the principal ground for granting a new trial in that case, was the want of an express direction from the court on the question of fraud. In the present case, there is no pretence of any such artifice, nor was there any allegation of fraud at the t-rial, and judging from the evidence alone, the silence of the respondents at law on the subject of fraud, if it did really exist, can only be imputed to their own inattention or neglect.
If we examine into the practice of the court of chancery, (1 Eq. Cas. Ab. 176; 1 Yez. 434; 2 Yez. 576; 3 Atk. 35 ; 2 Atk. 178;) we shall find it has adopted the same rules, with regard to its own determinations; and it is not pretended that the court will exercise a different control over the judgments of other courts, than over its own decrees. The cases of bills of review in that court, are analogous on this point; and the same principles have been adopted and established by repeated decisions. Thus Lord Hardwicke, with regard to bills of review, says, “there are always two points proper to be attended to on a petition for that purpose ; 1. To show that the new matter upon which such bill is sought, has come substantially and materially to the knowledge of the party or his agent, since the time of the decree in the former cause, or since such time as he could have used it to his benefit in the former cause ; 2. That it is probable such new matter is relevant. Again, it is held, that forgetfulness or negligence of parties under no *580 incapacity, is no foundation for a bill of review: and matter already settled, or which might have been put in issue, and settled in the original cause, shall never be drawn into examination on a bill of review..”(a)
In every light, therefore, in which this subject can be seen, whether we view it as considered by courts of law, with regard to their own 'determinations, or by courts' of equity, with regard to théir own decrees, of in relation to the interference of the latter with the judgments of the [*497] former, *the sanie rulés and the same principles ap-: ' pear to prevail. On the first question, I am, therefore, of opinion, that if any fraud existed, it was competent to give it in evidence, on the trial at law ; that it was-the duty of the respondents so to do, if they had notice of the fraud; that they had such notice, and for any thing that appears, had the evidence in their power as fully as at any subsequent period, and of course, that they are precluded by their neglect, and cannot, now, avail themselves of this defence.
This may, perhaps, be deemed a severe application of the rule, the summum jus between the parties; but I have sought with solicitude to- discover a principle on which I could with propriety depart from it; ■ and in every shape in which 1 have been able to turn the question, insuperable objections have .occurred. It still remained a question of *581 principle-on the one hand, and of feeling on the other. The magnitude of the property in question, alone can furnish no guide. It may and ought to have weight,,in cases of doubt or difficulty, but when principles are plain, it cannot, of itself, be made a ground of relief. It is incapable of any certain criterion.; in its nature nothing can be more vague; and if adopted, instead of legal rules and legal discretion, we must be governed by the fluctuating and arbitrary notions of magnitude which may be applied to every particular case.
I have dwelt more minutely on the preliminary question, not only because it appears to me sufficient to decide the cause, but because it involves a principle which I think of the first importance to the safe and effectual administration of justice. Nothing would appear to me more dangérous in the conduct of our courts, and more productive of endless litigation, than to open with facility their solemn determinations. If, in the instance before us, we should be of opinion that there is no foundation for the charge of fraud, it would, in itself, furnish a strong example to show the danger of renewing a controversy *already decided, [*498] and the ease with which new plans of defence may ' be invented, and even-supported by witnesses.
But there are other points in the cause, which appear to me to render it capable of an easy determination. Admitting the fraud to be open for examination, the appeal is "also from that part of the order which directs an issue at law. Here it is proper to notice, that after the original order for an issue was made, the parties agreed to submit to the court of chancery the question, whether the respondents were precluded, by the trial at law, as preliminary to the order for an issue ? By this agreement, 1 consider the order for an issue as having been suspended, until the decision on the question thus previously made. The order was then confirmed and rendered complete, and the appeal from this confirmatory order being strictly in time, brings up the question directly as to the propriety of the issue. Independent *582 of this, I think there can be no doubt, that by an appeal from any interlocutory or .final decree, all the proceedings in the cause anterior to the decree, are necessary to be presented to this court, and proper for its determination. It may frequently become indispensable to reverse, alter or modify the previous proceedings, in order to make1 them consistent with the-decree to be here pronounced. All antecedent matter is, therefore, necessarily, before the court, and subject to its control. I have also no doubt, that this court may proceed farther, if it appear that the merits are fully in its possession, and determine finally between the parties. That such is the power, and frequently the practice of the House of Lords, in England, is evident, from the cases which have been cited. (1 Bro. P. C. 57. 2 Bro. 405,415. 3 Bro. 180, 218. 4 Bro. 582. 5 Bro. 387, 454, 478. 6 Bro. 468. 7 Bro. 1, 208.) On similar appeals, they affirm, reverse, or alter the order for, an issue, and sometimes proceed to dismiss the bill, or otherwise decree on the merits. The power ' of this court is thé same, in this respect. I can see nothing .in our constitution or laws to restrain it. The constitution simply directs the court to be instituted, and the act [*499] of the legislature organizing the *court,‘ declares its powers in very ample terms. (Laws of N. Y. vol. 1, Nov. 23, 1784.) The words aré, that this court shall have power “ to reverse, affirm, or alter such sentence, judgment, decree or order, and to make such other order or decree thereon, as equity and justice shall require.” These terms are sufficiently comprehensive to authorize a final decree, nor shall we thereby assume original jurisdiction, An original jurisdiction is that which/takes cognizance. of -a suit ob origine. In this case, the'propriety of making a final decree arises out of the appeal itself, which brings before us the whole merits of the cause. The idea that we have not the constitutional lights of the chancellor’s reasons, with respect to the merits, is rather an objection of form. In fact, we have his opinion substantially on .the subject. He has told us that he has doubts on the question of fraud; that the evidence is not satisfactory; and that he wants further *583 testimony to inform his conscience. At least, such is the language of the decree, for otherwise, it could have been of no use to order a trial at law. If, therefore, we are of opinion that the testimony in the cause is decisive, either for or against the fraud, and that it ought not to be sent to a jury, what essential lights can we expect to receive, by sending it back for the chancellor’s decision ? We may place him in a delicate situation, and oblige him to decree on the evidence, as it stands, but we cannot compel him to alter his opinion, or remove his doubts. We can, therefore, expect no real benefit from such a proceeding, and I cannot imagine that the constitution intended so idle a ceremony. Indeed, the position that this court has not the power to make a final decree, in cases like the present, suppose a defect of jurisdiction, which ought not to be admitted without evident necessity. The power appears to me essential to a court of appeal in the last resort, and I have no doubt that it is vested here.
The propriety of the order for an issue, and of this court proceeding to a final decree, are questions depending on the nature and force of the-testimony. It is true, *that in some specific cases, it is the common course [*500] of the court of chancery to direct an issue at law ; but even in those cases, it depends on the practice of the court merely, and the chancellor has still the power of decide ing for himself, without an issue. In general, the ordering of issues depends on the application of sound legal discretion to the circumstances of the case. (2 Yes. 42, 554. 2 Atk. 450, 295. 3 Atk. 516. 2 Yes. 56.) It is a power in its nature indefinite, and incapable of being reduced to fixed rules. The chancellor is, constitutionally, the judge both of law and fact. Whether the institution of such a court be expedient or wise, is not now the subject of inquiry. Its power is established, and the trial by jury is there unknown. However excellent that mode of trial may be, it is not the right of any party seeking his remedy in that court to demand it. It ought regularly to proceed from the chancellor himself, to inform his own conscience, where the evidence is *584 insufficent for that purpose; and even with respect to him. it is not a power to-be exercised at pleasure, and depending on arbitrary discretion. In a government of laws, no such discretion can exist, and although no precise rules can be given, it is sufficiently certain, that if the evidence be doubtful, and from the nature of the question, or from the testimony already given, it appears that farther lights may be obtained, it would then be. proper to require farther proof ; and the chancellor may direct it to be taken, either in his own court, by new examinations, or send the qüestion for trial at law. But on the other hand, if the evidence be satisfactory or decisive in favor of .either party, the rights of such- party ought not again to be hazarded before another tribunal, and the chancellor ought to decide. Possessing the power, it would become his duty, for the power and duty of a court are concurrent,-and inseparable.
On the subject of the evidence, I shall not trouble the court with many remarks. It has been discussed for several days, and to examine it in all its parts, might occupy our attention as many more. Every member -must, I [*501] *think, have formed a decided opinion, without much difficulty. With respect to myself, I shall only say, that notwithstanding the contrariety of some of .the witnesses, relative to the fraud, the internal circumstances of the case, and the conduct of all the parties concerned, satisfactorily show, that the pretended fraud could not exist. The natural course of the transaction speaks^ invincibly, and car-, ries to my mind a full conviction. If this opinion on the evidence be right, the order for the issue was, of course, improper. The verdict of a jury cannot enlighten, but if contrary to the evidence,: may hereafter embarrass the cause. It cannot possibly be of Use, but must be injurious, -to send the parties through another course of litigation, and finally, perhaps, be obliged to decide between them under circumstances less favorable to truth and an equitable result. These reasons equally apply to induce us to pronounce a final decision in the cause. Possessing the power, I think it our duty to ..exercise it, apd put the controversy at rest. I am, *585 therefore, of opinion, on the several grounds I have mentioned, that the order for an issue ought to be reversed, and the bill of the respondents be directed to be dismissed.
Kent, J.
This cause presents three questions for the consideration of the court.
1. Does the judgment at law in favor of the appellant, bar the respondents from maintaining their present suit ?
2. If not, yet was this a case proper for an issue at law?
3. If an issue at law ought not to have been directed, shall this court now finally decide between the parties, the merits being fully before us, and if so, how shall we decide?
After the opinion which has already been delivered,(a) and in which I concur, it might, perhaps, be sufficient to refer generally to that opinion, as expressive of my own. But in a cause of so much expectation, and of so much magnitude 'to. the parties, it may not be altogether useless to go over the same ground, and briefly to declare my own view of the subject.
*1. Every person is bound to take care of his own [*502] rights, and to vindicate them in due season, and in proper order. This is.a sound and salutary principle of law. Accordingly, if a defendant having the means of defence in his power, neglects to use them, and suffers a recovery to be had against him by a competent tribunal, he is for ever precluded. [2 Burrow, 1009. 7 . Term Rep. 269. 2 Hen. Black. 414, 415.]
The only cases which I can recollect, as forming exceptions to this general rule, are :
1. The case of mutual dealings between the parties, where -the defendant omits to set off his counter demand, and may still recover it in a cross action ; and
2. The case of an ejectment, in which the defendant neglecting to bring forward his. title, is not precluded by the recovery against him, from availing himself of it in a new suit.
The general rule is intended to prevent litigation, and to preserve peace; and were it otherwise, men would never *586 know when they might repose .in security on the decisions of courts of .justice; and judgments solemnly and deliberately given, might cease to be revered, as being no longer the end of controversy and the evidence of right,
The principle prevails both in Courts of law and of equity.. In bills of review which are brought before the same tribunal to review a former decree, it is a settled maxim of equity, that no evidence or matter in the knowledge of the party, and which he might have used. in the former suit, shall be the ground of a bill of review. [3 Bl. Com. 454. 1 Eq. Cas. Abr. 81, pi. 4. 299. 2 Cas.- Abr. 176. 2 Atk. 178. 3 Atk. 35. 1 Yes. 434. 3-P. Wms. 371.] ;
“Unless. this relief,” says Lord Ch. Talbot, (3 P. Wms; 371,) “ was confined to new matter proved to have been discovered since the trial, it might be made use of as a method for a vexatious person to be oppressive, and for the cause never to be at rest.” “ A notice of the matter, even [*503] to the party’s *counsel or agent,” observes Lord Hardwicke, (3 Atk. 35,) “ is notice to the party, and sufficient to repel the new suit, for otherwise, there would be no end of suits.” . .
I have mentioned the observations of these great men, because the reason of the rule is laid down by them in plain.. terms, and receives the more authority, as coming from- two of the most distinguished ' characters that have presided in the English courts of equity. . -
Not only, bills of, review are denied, but, in pursuance of the same principle, a court of chancery never relieves against a verdict at law, on the ground of its being contrary to equity, unless the defendant below was ignorant of the fact at the trial, or it could not have- been admitted as a defence. [3 Atk. 223. 1 id. 293. Free, in Cha. 221. 2 P. Wms. 426. 2 Washington’s Rep. 258, 270, 272, 275.]
This being the general doctrine in the books, and the reason of it, I do, not. regard any solitary case, [2 Yern. 147. Prec, in Cha. 233,] that may be. found to the contrary,--as having any force to shake it.(a)
*587 It remains to apply these principles to the present case.
The suit at law of the appellant against the respondents, was a special action on the case,- for a breach of their duty as factors, in refusing to elect to receive the amount of the notes in Europe, and to give the appellant the requisite authority for that purpose. In consequence of this default the respondents became, in respect to the extent of the remedy, substituted in the place of Gomez, Lopez and Rivera, and responsible for the amount of the property. The breach of duty reached to the whole property, and the principal had a right to abandon it to them, and to regard them as appropriating the whole to themselves. [Yelv. 202. 2 Mod. 100. 12 Mod. 515.] This was the amount of the decision in the suit at law.
*Placed in the situation of Gomez, Lopez and Ri- [*504] vera, and subject to their burthen, the respondents took, of course, their advantages, and succeeded to the same means of defence. This is an universal principle of law and justice.
The respondents were, accordingly, competent to set up as a defence in the suit at law, the fraud alleged in the present action,, and there was nothing in the form of the action which precluded them from doing it.
If a factor neglects to make insurance for his principal, he is responsible for his default, in a like action on the case. Both the actions are of the same kind, and arising ex delicto. In such a suit, the factor may set up fraud, deviation, or any other defence which the underwriter could have made, had insurance been effected. [ Wilkinson v. Coverdale, Park, 303.] This is a case sufficiently analogous to be a direct authority in the present instance. The respondents were sufficiently apprised of the allegation of fraud, and that it was contemplated by Gomez, Lopez and Rivera, as a defence against the notes. They were informed of this by the bill previously exhibited by Gomez and Rivera, in the court be *588 low,¡against the parties in the present suit, stating the charge of fraud in the sale of-the goods. This was sufficient .to put the respondents on inquiry; whereas nothing is shown, from which we .can conclude that they actually made any inquiry, or took a single step to possess themselves of the means of that defence. All the testimony now produced was, for any thing that appears to the contrary, equally within their power then, as now, and yet no effort was made to produce it. The respondents did not even ask Gomez, Lopez and .Rivera for their proofs, or call on them, as they had a right to do, for their own indemnity and safety, by a bill of interpleader, to -come forward and make good their allegation. [Mitford, 125,-] They were guilty of gross' and palpable neglect, in thus slumbering upon this ground of defence, and must now be precluded from setting it up as a cause of eqtiita[*505] ble relief, against the verdict. It is *crassa negligeniia, if a party does not seek after a thing of which he is apprised, and m law amounts to a notice. So whatever is sufficient to put a party on inquiry, is good notice in equity. [2 Fonb. 155}
If I am not mistaken in the principles which 1 have laid down, their- application to the case before us is direct and pointed, and they operate with irresistible and conclusive efficacy to produce this result.
The attention of the respondents upon the trial at law, was, no doubt, occupied in defending themselves on-another ground, and, probably, they concluded that the ground which they took was stable and competent. This, however, makes no difference in the case. The law imposes it on every man to know, at his peril, the strength of his claim, and the. soundness - and extent of his defence. ‘ It indulges him.even to make as 'many separate pleas or kinds Of defence as he; may deem material, provided it be done in due season. In the instance before us, there can be no just pretext for surprise. The respondents had sufficient knowledge of the charge of fraud, and had they made, as they were bound to do, due inquiry and ordinary efforts, they could have obtained the proofs. But they have chosen to abide by one species of *589 defence, and to waive another, and like other litigants in in similar cases, they must be concluded by their election.
I am, accordingly, of opinion, on the first point, that the bill ought to have been dismissed, and, consequently, that the decree is wrong.
This opinion, if correct, puts an end to the cause. But as other members of the court may, perhaps, think differently on this point, I am willing briefly to examine the other questions, which have been raised and submitted for consideration.
2. The second point stated is this; supposing the respondents not precluded by the judgment at law, was it proper, in this case, to have ordered an issue to be tried by a jury 1
*The question on the order for an issue, I con- [*506] sider regularly before us, as the decree in the month of May, declaring that the respondents were not barred, and from which the appellant has appealed, repeated and confirmed the order for an issue, which had been previously, but conditionally given, and the chancellor in assigning his reasons,* and the counsel in their argument, have considered that order as open for examination in this court.
It is the undoubted jurisdiction of the court of chancery to decide both on the law and on the fact. This power it has always possessed and exercised. ' But in cases of doubt and difficulty, that court is .in the habit of calling for aid and information from abroad. If an important question of law arises in the course of the cause, before the court of chancery in England, it is the practice of that court to ask for assistance from the courts of law, either by associating one or more of the judges with the chancellor, in the hearing of the cause, or what is more usual, by stating a case and directing it to be argued in one of the courts of law, and to be returned with a certificate of the opinion of the court on the question submitted. This opinion when received is merely for information, and the chancellor may or may not follow it, as he, upon consideration, shall deem meet. [2 Tesey, *590 jun. 528, 529.] It is in like manner the practice of that court, and of . our court of chancery also, to. apply for aid to the courts of common law .when the truth of the fact litigated is doubtful, and. attended with difficulties. This the court does, not by asking the opinion of the court of law, but by directing a feigned issue to be tried by a jury. And the verdict of a jury upon the fact, like the, opinion of the •judges .upon the law, is merely to inform, and not to control the judgment of the. court of equity upon the question before it., It will be easy, therefore, to perceive, that ordering an issue must always depend upon sound discretion, to be cautiously and diligently exercised, according to the circumstances of each particular case; Instances are common in which the court of chancery has decided for itself in [*507] the first instance, although *there was evidence of weight on both sides.. [2 Atk. 295. 2 Yez. 256. Bamad. Gh. Rep. 100. Colles’ Cases, 49.] And where an issue has been • ordered, the House of Lords, in equity, have frequently on appeal, reversed the order, because the truth of the fact was sufficiently ascertained without it, and sometimes, where one or more verdicts have been actually taken, it has decided the cause in opposition. to them. [1 Bro. P. C. 58.]
If the testimony be. so contradictory, as that the truth cán not be discovered with certainty, and it Becomes requisite to judge merely on the credibility of witnesses, such an instance presents a case very proper and necessary for an issue at law, But in the present Case, I perceive no difficulty, and of course think there was no necessity for a jury. We can decide upon the allegation of fraud with, great certainty ; and'indeed the testimony never could have authorized and supported a verdict in favor of the respondents. This cause, then, ought to have.been decided in the court below, without the useless delay and expense of a trial at law.
3. This brings me to consider the third question in the case, viz., that having the merits before us, shall we not decide finally between the parties ?
I cannot bring my mind to doubt of the authority of this *591 court. It is the settled rule of the House of Lords, in England, upon appeals, always to give such a decree as the court below ought to have given. This is the great and leading maxim in their system of appellate jurisprudence, and instances are, accordingly, very frequent, in which the lords, on appeals from interlocutory orders in chancery, have reversed the order, and decided finally on the merits. (1 P. Wms. 673. 1 Woodd. 232, 240, 24J. 1 Bro. P. C. 58. 2 Bro. P. G. 408. 3 Bro. P. C. 183, 186. 4 Bro. P. O. 575, 582. 5 Bro. P. C. 454, 487. 6 Broi P. C. 469. 7 Bro. P. C. 222, 423.)
Their power on appeals is exercised with great latitude in dismissing the bill, or modelling the relief, or granting *it conditionally, as may best answer the ends of [*508] justice, and the exigencies of the case.
Our system of jurisprudence is borrowed from the English system, and in all its great outlines, as well as in its subordinate parts, is happily modelled after that admirable monument of the experience and wisdom of ages. Without some very explicit and peremptory limitation imposed by statute, I should have concluded, as a matter of course, that this court possessed appellate powers, corresponding with the jurisdiction of the House of Lords. I am persuaded that it was the intent of the act instituting this court, to give us the same ample and uncircumscribed authorities, for we are “authorized and required, on appeals from any decree or order of the court of chancery, finally to determine the same, and all matters concerning it; and to reverse, affirm, or alter the decree or order, and to make such other decree or order therein, as equity or justice shall require.”
The law, in the light in which 1 view it, appears to be a wise and salutary provision. No person doubts, but that an appeal will lie upon an interlocutory order of the court of chancery directing an issue. Upon such an appeal, the whole testimony, and the whole merits must come up. The cause must have been ripe for hearing, and the chancellor must have heard it, and have carefully examined the proofs, before he could have determined that the testimony raised *592 such doubts in his mind, as to render it fit in him to waive his own undoubted right to. decide on the facts, and to send, the parties to another forum for trial. Upon the appeal this court must likewise review the whole merits ; it must, in fact, decide on the merits, before it can judge of the fitness or unfitness of the order for an issue; and if it should-be of opinion, that the cause was too clear to admit of a reasonable doubt, and yet was under the necessity of remanding , it, to receive the ceremony of a previous decision in the court below, it would .answer no other purpose, but to maintain for a year longer, an irritating litigation. It [*509] would bé sending, the *cause back upon a fruitless and oppressive errand, and when, it returns, at the end of the year, with the parties more angry and more exhausted, and with a large accumulation of expense and véxation, it must terminate, in the same result then, as it ought to now. I can hardly persuade myself that the construction of our law can be a reasonable one, which requires such a nugatory act, and which leads to consequences so mischievous.
Possessing the authority to decide finally,, I think we ought to exercise it in this instance.. 1 assume it as a fact, and One on which we are bound judicially to act, that all,. the proofs are before us; that no new or further proof is behind and since discovered : that the cause is as ripe here, as it was in the court below, for ultimate decision; and if we are persuaded in our own minds, that the facts before us, can never support the allegation of fraud, we ought to say so, and put an end to the contention.
I have thus carefully examined all the questions of law, which have arisen in the. course of the cause. I forbear to recapitulate the facts. They must be familiar to every member of this court, and every member of the court is as competent to judge of those facts as myself. I will only observe, that in viewing the written documents, arid examining the intrinsic circumstances and internal evidence of the transaction, the truth strikes my mind with great clearness and force. • The whole complicated charge of *593 fraud appears to me to be absurd, inconsistent, and incredible ; and I should never be brought to yield my convictions to any verdict that might happen to establish it, with such slight materials, and on so frail a foundation.
My opinion, therefore is, on the merits, as well as on the first point of law, that the decree of the court of chancery ought to be reversed, and the bill dismissed.
Benson, J. was of the same opinion.
Lewis, J. was of opinion that the decree ought to be affirmed.
*Lansing, Ch. J.
The questions which have [*510] been raised in the argument of this cause are,
1. Whether the respondents are now precluded from insisting on the fraud, admitting that it had been practised?
2. Whether the preponderáney of proof, on either side, was such as to impose it on the chancellor to determine between the parties, without seeking to inform his conscience by awarding an issue?
3. Whether this court, being possessed of the cause, on an appeal from an interlocutory order, can decide finally ?
The general principle that a point determined by a court of competent jurisdiction, shall be conclusive against all parties who were in a situation to controvert it, is so well established, as to leave no doubt in my mind. The reasons which have already been given are such, as in my opinion, are sound, and clearly establish both the legality and the utility of the rule.
The respondents were sued for withholding the production of the sales of certain quantities of cotton and indigo from the appellant, who had entrusted them with the disposition of those commodities, as his factors, and a judgment was rendered against them for the amount of the value ascertained by the contract of sale. The cotton and indigo, now the subject of controversy, are the same which the respondents in the former action had withheld.
As fraud vitiates every contract, and as, if the fraud was actually committed, it was competent to the respondents to have shown it, in destruction of, or in mitigation of damages *594 in that action, the strict rule of law would, as they neglected the opportunity, preclude them from alleging it now, as.a reason for opening the question; for if the respondents could have shown that they were precluded on account of the fraud, from recovering the whole or any part of the amount of the sales from Gómez, Lopez and Rivera, they [*511] would have *been permitted to avail themselves of that circumstance, at least to vary the measure of damages, and it is hot now contended that it ought to have a different effect. There are, however, points in this cause, which would incline my mind to consider this as an exception to the general rule. The object to which the attention of the parties was exclusively drawn in the former action was the substitution. It appears that though there was some notice that a fraud of this kind was attributed to the appellant, the charge was not matured. The facts on which the evidence of its existence rested, were discovered in Europe. The knowledge of that evidence, it appears, was, in a great measure confined to Gomez, Lopez, and Rivera, and their agents. The knowledge of the respondents, as acquired from their own observation, did not extend to it. The positive denial of the appellant that it' had existed, must have confirmed them in the opinion that the imputation was unfounded; and this defiial must, if fraud existed, have been unwarrantable artifice, calculated to confirm the respondents in. the impressions they had received from their, own observations; and though I cannot admit that a new principle was devised to govern the former case, the result of the trial, it was obvious, operated as a surprise on the respondents •, and if. a fraud had been committed, the appellant’s measures for concealment were persevered in, to the last moment. All these circumstances would have mingled in the consideration of the court, if an application had been made for a new trial. I think these considerations may well operate to constitute this case an exception to the general rule; but from my impressions as to the second question, a determination. of the first is not essential to a decision on the merits of this appeal.
*595 Having examined the answers of the parties, the depositions, letters, and ether papers exhibited in the cause, I am fully persuaded, that the allegation of fraud is totally unsupported ; that it cannot consist with the relations of the witnesses produced to support it, and that in every stage of *the transaction, it carries its own refuta- [512] tion with it. 1 have, therefore, no hesitation in saying that I am perfectly convinced that no fraud existed. With this general declaration, I had intended to dismiss this part of the subject, as it is a question of fact, not involving any legal principles, and, therefore, not peculiarly my duty to enter into a discussion of it, and as every member of this court has had an opportunity of examining and determining for himself; but as a difference in opinion -exists, oil the nature of the evidence, and as some members of the court may consider it as of that doubtful complexion which may render it a fit subject for the determination of a jury, it is proper, as explanatory of the general conclusion I have drawn from the evidence, and from a respect to the opinion of those gentlemen with whom I differ, in a cursory manner, to state the impressions the several parts of the testimony have made on my mind. It may, however, not be amiss to premise, that whether the warranty was promised to be reduced to writing, whether it was actually so reduced, or whether it depended on a verbal allegation that the commodities sold, were of a particular description, would not materially vary the result. Fraud might be inferred by a less direct process, or less certain data, and the evidence of its existence might, from those circumstances, be susceptible of a different modification; but the fact being once established that the sale was fraudulent, it would, -in any of those cases, as effectually destroy the benefits acquired by the party guilty of the fraud, as if the warranty was reduced to writing. The evidence, therefore, respecting the warranty is no further material, than as it affords a mean to test the consistency of the witnesses in giving their testimony relative to it.
Hester Gomez and Mary Wright testify, that in several *596 conversations, the ■ appellant asserted that the cotton was of the growth of the’Isle of France, and the indigo to be of two qualities, Flotang and Violet Copper.
Abraham Massias gives the same relation as to the- allegation of the appellant, and adds, that Gomez, Lopez [*513j and *Rivera wished to delay the conclusion, of the bargain for a few days, for the purpose of examining the articles; that the appellant objected to delay, -because the drawback would Be lost, and offered by Way of obviating the difficulty, to warrant the quality of the articles. With this relation the deposition of Samuel Lopez corresponds.
Without resorting to the testimony of the witnesses, with whom they have been particularly contrasted, I shall proceed to examine the other evidence in the cause.
• It appears that an advertisement was published by Gouverneur’ & Kemble, describing the cotton as Amoude, which is the best kind of Surat cóttón; that this was continued for a considerable timé; that after the intermission of a few weeks, another advertisement was published by them, offering the cotton for sale, and as affording a great Speculation for France.
Some time after the publication of the second advertisement, the respondents informed the appellant that an offer had been made for the cotton at three shillings a pound, by three persons.
William Dickson, a person conversant with cotton,- declares, that in February, 1795, he offered three shillings and six pence for the cotton, and eighteen shillings for the indigo, for a person who had freighted his ship, the Astrea, but that it was refused, because sufficient money could not be paid down, and because the appellant insisted on retaining the drawback; that he had..'before examined the cotton in bales, and saw some of the boxes of -indigo opened long before the offer to purchase.
Whether the offer alluded to in the respondent’s letter was that of Gomez, Lopez and Rivera, or of three other persons, is of little importance. The offer must either have been *597 made from the inspection of the bales, or samples furnished, to representations made by the respondents, and if those samples or representations, or that inspection, dictated the offer of three shillings a pound, it is a strange argument that the representation of the respondents and of *the appellant must have been of the same import, [*5,14] or that the quality of the cotton corresponded with the description given of it by the appellant, or they could never have produced similar effects, for the price of Isle of France cotton, compared to that of Surat, we find, by the concurrent testimony of all the witnesses, to be in the proportion of nearly two to one, during the fluctuation of the prices of those articles.
Two or three witnesses swear, and respecting this there appears to be no controversy, that the mode of packing of the Surat cotton is essentially different from that of the Isle of France; that it is so striking to persons conversant in the trade in that commodity, as to enable them to determine of which of these two places it is the production, merely from the external appearance of the bales.
If Massias and Samuel Lopez are to be credited, the attention of Gomez, Lopez and Rivera, was early awakened to the quality of the articles they intended to purchase. They wished to delay the contract a few days, to enable them to have a particular examination made before they closed it, and one of them describes the particular object they had in view in requesting the delay ; the expectation that a person in whose skill they had confidence, would arrive from Philadelphia. The contract describes the articles sold, as upwards of 600 bales of cotton, and about 12,000 weight of indigo ; but from the accounts of sales rendered by the respondents, it appeared that the quantity of each was accurately ascertained, by weighing them before they were shipped, during which process, another opportunity was afforded for inspecting them, better than could possibly have been had, during the time they remained in store. If the fraud was really practised, as alleged, abundant means were presented for detection, especially as the indications of a differ *598 ent quality from1 the production of the Isle of France were" so discernable. . But to this it is answered, that Gomez, Lo-' pez and Rivera depended upon ■ the warranty with implicit confidence. Ma'ssias, however, testifies that the omis[*515] sion of it in the contract was discovered *several , days before the vessel sailed, and that application ' was made to the appellant to insert it; that he declined, alleging the difference which subsisted between him- and' the respondents, as a reason for not. correcting the omission. It does not appear that any application was made to the respon-’ dents on the subject, though it was well known that they had entered into the written contract, and retained it in their hands; and Massias states that very detention as a cir-' ctimstance that led to the discovery, as the respondents declined furnishing the appellant with a copy of the contract.
These circumstances are of a nature not easily to command a tolerable share of credit. That Gomez, Lopez, and Rivera should be disposed to delay .a contract" of such im- ■ mense importance to them, for the purpose of taking so common a precaution as to procure a skilful person to inspect the commodities they intended to purchase, has nothing extraordinary in it; but that they should be totally diverted from that object by the stipulation for a warranty by a stranger, and forget to exact the evidence of his having made it, is so repugnant to the ordinary mode of conducting business,;' as' to require a'more satisfactory account than the witnesses produced have given. "
All the witnesses who attest to the prices are persons, as far as we know, of ünimpeached characters, excepting so"" far as the matters they relate may detract from their credibility. .
. They state the prices of cotton of the production of the Isle of France, to be about double to that of Surat. Four witnesses swear that, during the year 1795, the prices of Isle/ of France cotton were from 5s. to 6s. a pound, and St. Do,mingo from 2s. 6d. to 3s. 3d.
Mr. Murray alone mentions the Isle of France cotton to" be, in the spring of 1795, at 3s.' and Surat at Is. lOd. a *599 pound. This varies the proportion of the prices in some degree.
I can have no doubt, from this- view of the proof, that Surat cotton was worth, estimating it at the market price, *about 3s. a pound, in the month of April, as [*516] there is no proof of a reduction in the price of that article, before that time.
The indigo, in my apprehension, affords, from the course of the transaction, equally strong evidence that what was testified with respect to the warranty, and the circumstances attending the deception, alleged to be practised in its sale, is equally unfounded.
The indigo was put up at the Isle of France, at least before it was shipped at that place, on board of the Cleopatra. It is not pretended that the packages in which it was imported were changed; if they were, as it is clearly in proof that immediately upon its arrival, it was committed to the care of the respondents, it must have been done with their privity, or under their direction. This also is hot pretended j- but Isaac Gomez, whose correctness or integrity has not been questioned, and who does not appear to have any connection with the parties, or the matters in controversy, declares that he examined the indigo in 1794; that he discovered it, as far as he had examined, to consist of three qualities, which he valued at 8s. 10s. and 12s. a pound, and that the appellant interrupted his examination before he had gone through - the whole. Massias and Samuel Lopez declare, that upon the opening of the indigo, it was discovered that there was a layer of good indigo, corresponding with the samples, on the top of the boxes and casks, and that the remainder was of an inferior quality. If, however, the indigo was not repacked, the same surfaces must have been presented which were prepared in the Isle of France, and exhibited in New York, and hence the deception must at least have continued till the arrival of the indigo at London; but we find, though the selection of Samples was made with so little attention as not to have attracted the particular notice of Massias or- Samuel *600 Lopez, that they were of four or five different qualities.
Massias says positively that- there were five.
[*517] *If these samples had been taken from the surface, the indigo, in the interior parts of the packages, must ay least have produced an additional kind, respecting which both those witnesses are silent. If they had gone below the surface, the persons engaged in the selection- of the samples musVhave discovered the deception, the instant they penetrated to that of an inferior quality.
If it had been so discovered, it is not possible that Gomez, so materially affected in his interest by the fraud, would have remained silent on the subject; but that he advised his partners of it from London, has <not even been suggested.
Isaac Gomez, jün. in his letters to Gomez &• Lopez, from Hamburgh, stated that the markets were low at that • place ; that though there were imaginary prices, there were no purchasers ; that London afforded the best market, but that at Hamburgh he must sustain a loss of sixty per cent, on the adventure. > ‘ -
In his letter of the 21st of September, from London, the amount of loss is not stated, but it is said, there is an appearance of great loss. If this observation applied tó the real quality of the cotton, Surat, his statement was correct, that a heavy loss was probable ; but if it applied to cotton of the production of the Isle of France, all the proof we have in the cause leads to the conclusion, that instead of a considerable loss, it must have yielded a handsome profit. The conclusion, in my mind, is irresistible, that Gomez knew the quality of the cotton, before the 21st day of September, the date" of his first letter from London. MaSsias and Samuel Lopez concur, that the discovery was first made on the production Of the samples to Smith-& Atkinson, at .London.
An argument made use of by one of the counsel om the part of the appellant, appeared to me to have great weight; and that was, that if the fraud was contemplated in India,
■ and the packages deliberately prepared for the express pur pose of deception, the warranty attributed to the appellant *601 must unavoidably operate to defeat the purpose, and expose the appellant to inevitable detection, [*518] without a possibility of being benefited by it, and the consequences of a detection would more immediately attach to him, as it was not doubted, but he was sincere in his in tention to follow the cargo to its port of delivery. These could not well consist together, unless we suppose the appellant to be as ignorant, as the witnesses represent him to be artful and designing.
It appears that Isaac Gomez, jun. arrived in London some time in the month of September, 1795 ; that on the 21st of that month he wrote a letter to Moses Lopez, in which he expresses, in very strong terms, the concern he . felt on account of the ruinous consequences of the speculation ; proposes to devise expedients, by repeated investments, to replace the loss, but gives not the remotest intimation of a fraud, nor does the possibility of repelling the effects of the imposition appear to be contemplated as a resource to avert the ruin he seems so solicitous to avoid.
Tested by these circumstances, the relations given by the witnesses on the part of the respondents, have little weight with me; nor is it, in my opinion, necessary, in order to discredit them, to call in the aid of the testimony given on the part of the appellant. If no witnesses had been examined on his part, I should not have been able to resist the conviction which the mere circumstances I have cursorily mentioned impress on my mind.
There is another point of light in which this matter may be considered, and which would direct my mind to the same .conclusion, if those circumstances were less strong, and that-is the oath of Moses Lopez.
The association of several persons for commercial purposes, is derived to us from the law of merchants. It supposes a unity of persons and a unity of interests, represented by the name which they elect to designate their firm. It is evident,, that with a set of men so associated, the dictates of policy and justice must, of' necessity, require, that the act of *602 [*519] every copartner of the firm, in *all matters relating to their common concerns, should be considered as the act of the whole. . If that were not the case, collusive separations, or artful appearances of enmity might be held out to serve their purposes, at the expense of those with whom they had, dealings. This unity of persons and of interests, and all the consequences derived from that doctrine, they are strictly and rigorously held to at law. I know of no instance where it has been held otherwise, and in a court of law,, it does not lie in the mouth of the firm to disavow the acts or declarations of the persons constituting it. In chancery, the rule is somewhat different ; it admits of the exception of a collusion between any of them and a stranger, to the prejudice of the firm ; but to separate their interests, the collusion is not to be collected from remote intendments, from an existing enmity, and, in my opinion, not even from an express avowal of either of the copartners, unless coupled with acts or declarations of the person with whom he is charged to collude.
I can discover nothing in the conduct of the appellant from which a collusion can be rationally inferred between him and Moses Lopez. If no such collusion exists, his declarations simply, (and here they were voluntarily made under the solemnity of an oath,) must be - considered as those of, one of the parties in interest, under the contract, and operate accordingly.
It is said that Moses Lopez, so early as the 28th of May, £.795, transferred his share in the cotton and indigo, to Isaac Gomez, jun. and hence it was inferred that his relation as to this transaction was changed ; but though he parted with his share, he remained liable on his. contract, for it was essentially necessary to have the approbation of the appellant, in order to dissolve the engagement subsisting on the contract.
In a case thus circumstanced, I cannot discover, what good consequence can possibly be obtained by referring it to á jury, to determine on .the fraud. If they should give a verdict in favor of the respondents on that ground, *603 I *should think that it ought to be set aside as [*520] against evidence. Issues are always awarded in chancery, not at the instance of either of the parties, but from the volition of the chancellor. This, however, is to be exercised in sound discretion, and if circumstances occur which give a controling preponderance of testimony on either side, it is his duty to decide according to such preponderance. On this I had some doubt, but I am, upon reflection, convinced that it is his duty to do so, and that if he does not, but refers it to a jury, it will warrant an appeal. A reference to a jury may increase, but cannot remove embarrassments. It is not one of those cases which requires a jury to pass up on the matter to inform the conscience. The conscience has already taken a direction from which it cannot be diverted, and the trial' of an issue can have no other effect than to devolve the responsibility of the decision on the jury, if their opinion agrees with that of the chancellor. If it does not, he will, of course, by ordering a new trial, conform the verdict to his own opinion. This would, in its effect, be a nugatory process. It is such a one as, I think, ought not to receive the sanction of this court.
The third question appears to present a point of much importance to the jurisprudence of the state. I am satisfied that the doctrine which has been laid down, showing that the powers of this court extend to th.n final decision of this cause, on the present appeal, is such as will fully justify our pronouncing a final decision. It is not necessary to determine how far it would be proper for this court to exercise a jurisdiction, which might be considered as original, in contradistinction to appellate. The constitution of this court is not calculated, and its members are too numerous for the exercise of, the decretal powers of a court of chancery, in the first instance. The clashing of opinions, inseparable from numerous bodies, must, in many cases, produce a less harmonious result than that originating from the decision' of a single person, in matters of so multifarious a kind, as a .chancery *cause not unfrequently presents. This [*521] *604 inconvenience is avoided, by confining the exercise of the powers of the court to matters- strictly appellate.
But though this reasoning appears to me .very cogent, it is, I think, -not: applicable to this case. The powers of this court, as exercised in dismissing the bill, arise from the subject. If this court decide against the order for the issue, it must be on the ground, that it is so clear as to render- it unnecessary for the information of the conscience of the court to send it to a jury. It amounts to a declaration that the respondents have hot sustained their- bill; if so, and it is remittted to the court of chancery, what other effect can it have, than merely to send it through its different stages in that court to a final decree, to produce the same effect which a dismission of the bill would have here? The conscience of the chancellor will not be better informed, when he becomes again possessed of the cause, than he was before the appeal; and if the opinion of this court is to be conclusive upon him, as it will be, if it is- expressed, he will formally pronounce a decree conformably to it. If he decides on the evidence, and decides in favor of -the respondent's, we shall have another appéal on that ground, and must ultimately pronounce the same decree which, I think, it is now incumbent on the court to do, that the respondents’ bill be dismissed.
I refrain from saying anything further on the subject of the trial between the respondents and Gomez, Lopez, and Rivera, than that,- as it was between parties with whom the the appellant had no connection, it cannot affect his interests.
The fact was, that the two parties adverse to each Other in the cause, were united in a common Opposition tb the appellant ; that their interests might be combined to conclude him. The appellant was not obliged to confide his interests • to them farther than he has done. His connection with the .respondents was dissolved. It -might, if he had [*522] united himself with the respondents, have indirectly-affected his interests. He was not bound to do it, and the manner of conducting the trial on the part of the *605 respondents was not calculated to. give him any strong inducement to the measure.
I therefore repeat, that I think this does not vary the situation of the parties; and that the bill of the respondents ought to be dismissed.
A majority of the court were also of opinion, that the order of the chancellor complained of, should be reversed, and the bill of the respondents dismissed.(a)
After the court had pronounced their decision,
Burr, for the appellant, moved for costs and damages to be assessed against the respondents. He contended, that as the charge of fraud had been found wholly groundless, the appellant ought to be indemnified for the interest of the debt, which had accrued, and for all his expenses over and above the taxable costs. He cited 2 Burr. 1086, 1087. 1 Bro. P. O. 464,578. 2 Bro. P.0.576. 3 Bro. C. P. 70, 81.
Hoffman, (Attorney General) for the respondents, on the other hand, insisted that costs and damages are never allowed on decrees of reversal, and for dismissing the bill. He cited 1 Bro. P. C. 181, 591. 2 Bro. P. O. 15, 286, 398, 404,456. 3 Bro. P. O. 366. 4 Bro. P, C. 152, 227. 5 Bro. P. 0. 466. 6 Bro. P. C. 27, 480,492. 7 Bro. P. 0. 59,110, 303, 373, 432. He said, that only one case could be found, of costs allowed on reversing a decree, which was that Of 2 Bro. P. 0. 165, and that only allowed the costs of the proceedings in the court below; that when the judgment of the supreme court was affirmed in error in 1798, the interest was allowed on the judgment down to *the [*523] time of affirmance and the whole money was paid into the bank in 30 days thereafter.
The court took time to consider of the application, and on *606 the 28th February, Mr. Justice Benson delivered the unanimous opinion of the court, on the question, in substance as follows:
I have looked into all the cases, and I find this to be the rule on the subject of costs in error.
1. That if judgment be given in the court below against the plaintiff and he bring error, and the judgment in the court below be reversed, he recovers only the costs of the action below, because the court of errors gives such judgment as the court below ought to have given, and none other; and it would be unreasonable to compel a person in case of a reversal, to pay costs for the error of. the court be" low. The cases are express and decisive. [1 Strange, 617. 1 Anstruther, 180, 183. 1 Salk. 252.]
2. If the plaintiff below recover, and the defendant below bring error and reverse the judgment, he obtains. no costs unless it be the costs of the court below up to the judgment,
All the cases cited by the counsel for the appellant, apply to the costs of the action below. There is not a single instance where costs of the writ of error or appeal were given, on reversing the judgment or decree below, for that would be making the defendant in error pay for the wrong judgment or decree of the court below. The case in 1 Bro. P. 0. 578, has the appearance of an exception, but it is not one, for there, on the reversal, costs were given conditionally, that the responents on paying the costs of the appeal, might bring the cause again to a hearing in the court below. [*524] The case in 2 Bro. 165,(a) which *the attorney general thought against him is not so ; for in that case, on reversing the decree and dismissing the respondent’s bill,- he was ordered to pay to the appellant the costs of the proceedings in the court below; and that was doing no more *607 than giving such a decree, as the court below ought to have given.
In the present case, therefore, we are of opinion, that the respondents should pay to the appellant the costs only of the proceedings in the court below, up to the time that the order for as issue was made absolute. v
It was thereupon ordered, adjudged and decreed, that the order of his honor the chancellor be reversed ; and that the biil of the respondents be dismissed, with the costs in the court of chancery, and it was further ordered, that each party pay his own costs on the appeal.
Judgment of reversal.

 The general principle here stated has become firmly fixed in the jurisprudence of the country. Interest reipublicce ut sit finis litium. Etheridge v. Osborn, 12 Wend. 399. Gardiner v. Buckbee, 3 Cowen, 120. Burt v. Sternburg, 4 id. 559. Rice v. King, 3 Johns. R. 20. Smith v. Whiting, 11 Mass. R. 445. Young v. Black, 7 Crunch, 567. Church v. Leavenworth, 4 Day, 274. Eastman v. Curtis, 4 Verm. R. 616. Sackett v. Gwathmey, Litt. Sel. Cas. 121. Wallace v. Usher, 4 Bibb, 508. Martin v. Hunter, 1 Wheat. 304. Smith v. Maryland, 6 Crunch, 286. Taylor v. McKnight, 1 Missouri R. 282. Hayden v. Booth, 2 A. K. Marsh. 353. Hibshaum v. Dulleban, 4 Watts, 183. Leavensworth v. Tomlinson, 1 Root, 436. Campbell v. Phelps, 1 Pick. 62. Marsh v. Piler, 4 Rawle, 273. Thus, a judgment rendered on a promissory note is a good bar to an action on such note, though blank spaces are left in such judgment for the amount of damages and costs. Wells v. Dench, 1 Mass. R. 232. And in an action on the case, in the nature of a conspiracy for obtaining goods by false representations, a judgment on the merits is conclusive, and a bar to any new form of action. Livermore v. Herschell, 3 Pick. 33. And a judgment in favor of the plaintiff, in an action of trespass to try title, is conclusive, between the parties, as to all titles which the defendant had at the time of the trial. Caston v. Perry, 1 Bailey, 533. “ And the principle applies in almost every instance, where a suit is sought to be sustained upon allegations which would have constituted proper ground of defence to a previous action between the parties. Thus, in Marriott v. Hampton, 7 Durn. & East, 265, H., the defendant, had formerly sued M., the plaintiff! for goods sold and delivered, for which M. had before paid H. and obtained his receipt; not being able, however, to find the receipt at the time, and having no further proof of the payment, he was obliged to pay the money again, and gave a cognovit for the costs ; afterwards he found the receipt, and prosecuted to recover back the sum so wrongfully enforced in payment; and *572 it was held, on motion for a new action, that the action could not be sustained.Per Lord Kenyon, Ch. J.: 1 After a recovery by process of law, there must be an end of litigation, otherwise there would be no security to any person. I cannot therefore consent, even to grant a rule to show cause, lest it should imply a doubt.’ Lawrence, J. alluding to a case relied on by the plaintiff’s counsel, says, ‘ It goes the length of establishing this, that every species of evidence, which was omitted by accident to be brought forward at the trial, may still be of avail in a new action to overhale the former judgment; which is too preposterous to be stated.’ The other judges delivered opinions to the same import. See ICist v. Atkinson, 2 Campb. 63. Moody v. Thurston, 1 Strange, 481. Bateman v. Willoe, 1 Sch. & Lef. 201.
“ Upon the same principle, a junior mortgagee, made a party to the bill of the elder and neglecting to defend, will be barred. Cooper v. Martin, 1 Dana’s R. 23, 27. So where B. sued G. for not doing work in a skilful and proper manner ; and it appeared that G. had before sued B. to obtain pay for the identical work, in which suit B.’s claim set up in the present action was urged by him, and erroneously rejected by the court, who gave judgment for G.’s work at the price stipulated between the parties ; yet held' that B. could not sustain his action, for the ground of it was matter of defence in the former suit, and he should have pursued his remedy directly there by certiorari to reverse that judgment, and could not overhale it in a collateral proceeding. Grant v. Button, 14 Johns. R. 377: S. P., Kist v. Atkinson, 2 Campb. 63. And where P., having given his promissory notes to L., paid the same without taking them up ; and -after such payment, and subsequent to the time of the notes coming due, L. transferred them to S. L., who sued G. thereon and had judgment for the amount; held, that as P. had neglected to avail himself of the payment by way of -defence to the suit of S. L., he could not maintain an action against L. -for the money thus recovered by S. L. Loomis v. Pulver, 9 Johns. R. 244. So also where A., being charged with -taking B.’s bridle, gave B. a note, the 'latter promising that if it should turn'out -that A. had not taken the bridle, he would give up the note; when the note became due, B. sued A. upon it and obtained judgment for the amount, -which -was accordingly paid ; and the court held, that such judgment, while -it -stood in full force, should prevent A. from recovering the money so paid on B.’s judgment, though A. offered to prove his entire innocence of the charge respecting the bridle. The ground of the second action, say the court, was proper matter of defence to the first suit, and if A. was not-in a situation at that time to make out that defence by proof, 'it -was his misfortune. White v. Ward, 9 Johns. R. 232. See S. P., Battey v. Button, 13 id. 187. Canfield v. Munger, 12 id. 247. The same rule-has been ad'opted in New Hampshire. Thus C. ■ and D. sold H. a patent right, for which H. gave them his notes; one of the notes was paid voluntarily, but the other was sued by C. and D., and a judgment obtained for the amount, which H. accordingly paid. -H. subsequently *573 brought an action to recover back the consideration money, on the ground that the patentees were not the original inventors of the thing patented, and the court held him concluded by the previous recovery; for when sued for the consideration, he enjoyed an opportunity to defend himself by establishing this fact; and if such defence was not made, ‘ the omission arose from such accident as would entitle him to a new trial, or from such ignorance and neglect as are irremediable.’ Holden v. Curtiss el al., 2 N. Hamp. R. 61, 64. Tilton v. Corden, 1 id. 33. So also in Massachusetts. Thatches v. Gammon’s exr’s, 12 Mass. R. 268. Homer v. Fish, 1 Pick. 435. Holmes v. Avery, 12 Mass. R. 136. And in Pennsylvania. Shriver v. The Commonwealth, 2 Rawle, 206. So far indeed has this respect for former decisions been carried, that where an action was brought for malicious prosecution, the court held a record of conviction in the suit charged as malicious, conclusive evidence of probable cause. Whitney v. Peckkam, 15 Mass. R. 243. Williams v. Woodhouse, 3 Dev. R. 257, S. P. Mellor v. Baddeley, 6 Carr. & Paine, 374. The courts in New York, however, have repudiated this doctrine. Burt v. Place, 4 Wend. 591.’’ Cowen & Hill’s Notes to 1 Phill. Ev. 830, 831, 832.
“ But although the second suit is predicated upon matter which might have been used as a defence in the first, yet if it involves no inquiry into the merits of the former judgment, and is sustainable on ground entirely independent of such judgment the rule does not apply. This exception was distinctly recognized by the court in Whitcomb v. Williams, 4 Pick. 228. There the plaintiffs had purchased goods of the defendants, and paid for them partly in cash and partly by their note ; they subsequently discovered that they had paid for more than they had received ; but nevertheless, suffered a judgment to go against them on the note, without objecting any want of consideration; and it was held, that an action lay to recover back the amount overpaid ; for the giving of the note, under the circumstances, being equivalent to payment in cash, a cause of action originated immediately thereupon which steered entirely clear of the judgment; and 1 although the. mistake might have been corrected in that action, the present plaintiffs were'under no .obligation,’ says Wilde, J. delivering the opinion, ‘ to avail themselves of that mode of seeking relief. A new remedy arising on a contingency will not deprive a party of a pre-existing right of action. The plaintiffs had the right of election, like a party entitled to the privilege of set-off.’ Id. 228, 231. And where A. sued B. before a justice, and prior to the return day of the summons, B. settled with A., and paid him $3, in full, A. promising to discontinue his suit; instead of doing so, however, he appeared on the return of the summons, and obtained judgment in B.’s absence of $25 ; B. then brought an action of assumpsit against A. before another justice for a breach of the promise to discontinue, and recovered the same amount which A. had recovered against him ; and the supreme court held the recovery correct; for the suit was not to overhale the first judgment, or to recover back the amount .of it, on the ground that it *574 was not due, but to recover for a breach of the agreement, -and this breach would'have been the same, even if the former recovery had been for a just debt. Cobb v. Curtiss, 8 Johns. R. 470. So where money has-been paid.and a receipt taken, and afterwards the party to whom it was paid brings an action for the same money and recovers, no defence being made ; though the neglect of the defendant in not availing himself of the receipt in that suit, will forever preclude him from recovering the money thus paid, yet there being a moral obligation oh the part of the plaintiff to repay, the. defendant may recover on a subsequent promise of the plaintiff to that effect. Bentley v. Morse, 14 Johns. R. 468. And where A. extended an execution on B.’s real estates, and thereby became tenant in common with C. ; and then obtained judgment against C.-for a share of the'rents and profits accruing subsequent to the ex-tentbut after C.-had paid' A.’s judgment, the judgment against B., upon which A.’s execution issued, was reversed-; held,.that C. could recover against A. the money thus paid by him for rents and profits, though A.’s judgment, against him remaine'd in full force. The court say, that judgment was-right, ‘ nor does the present action impeach it; but the defendant has no right, from posterior circumstances, to retain the proceeds of it. And when one wrongfully detains money, although it was rightfully received, the action for money had and. received furnishes a just and appropriate remedy.’ Lazell v. Miller, 15 Mass. R. 207. So where A. recovered judgment by default against B.; upon an account annexed to his writ, in which account B. was credited for certain goods ; held, that such judgment was no bar- to an action by B. against A.,for the same goods; if they were not credited' at their-full value by A. in the first suit. For though-the valué of the goods credited by A. was a question which B. might lawfully have litigated there, yet he was not bound to do so at his own expense, when by commencing a new actionthe expense would fall on A. If A. intended to avoid this, he should .have credited the goods a-t their full value. Minor v. Walter, 17 Mass. R. 238. Andwhere an-attorney, received a partial payment from a debtor, oh a note left with him for collection, paid it over to the creditor without-endorsing it, and afterwards proceeded and took judgment for the whole amount apparently due ; he was held liable to the'debtor for-the amount of such payment in an action for money had'atid received. Fowler v. Shearer, 7 Mass. R. 14. The same principle was applied where the person receiving the partial payment was plaintiff in the first suit and defendant in the second, the substantial details of the case being in in other respécts like the preceding: and Parker, Ch. J. delivering the opinion,thus explains the ground upon which both decisions proceed: ! Here the creditor, by his own fault, recovered judgment for his whole- debt, when a part of it had been paid. It was his duty to have credited the sum paid on the note, and not having done it, he is to be considered as retaining the monéy for the use of his debtor. The debtor might well lie by, and suffer judgment by default, relying upon a deduction of the sum paid before judgment. ' The- *575 ease of Fowler v. Shearer, cannot be distinguished from this; for in that, as well as this, the plaintiff might have given evidence of his payment; but he confided in the attorney, that the sum paid should be endorsed upon the note. In the case of Marriott v. Hampton, the plaintiff brought his action to recover money paid under legal process, which was thought dangerous. In the case before us there is no such technical difficulty. It is not attempted to disturb the judgment; it is not complained of; it is not alleged that too much has been recovered. The ground of the action is, that the defendant has received fifty dollars of the plaintiff which he is not entitled to retain. He might have retained it if he had chosen to endorse it on the note, or to deduct it from his damages ; but not having done either, he cannot conscientiously retain the money.’ Rowe v. Smith, 16 Mass. R. 306. The contrary, however, of this, has been expressly and deliberately held in New Hampshire ; thus, in Tilton v. Gordon, 1 N. Hamp. R. 33, wfiere a party made certain payments on a note, and afterward, on being sued, suffered judgment to pass against him by default for the whole amount, without any deductions, he was adjudged incapable of recovering for the moneys so paid in a subsequent action. And even in ¡Massachusetts, where Rowe v. Smith, and Fowler v. Shearer, supra, were decided, the principle has been restricted to those cases where a trust and confidence existed between the parties, which the defendant in the first suit acted upon, and such as was deemed sufficient under the circumstances, to excuse his neglect in not availing himself of the payments by way of defence in the former action. And therefore, where the plaintiff in the second suit appeared in the first and contested the point of damages, he was held not entitled to recover. Loring v. Mansfield, 17 Mass. R 394.” Cowen & Hill’s Notes to 1 Phill. Ev. 832, 833, 834. Consult further upon this subject, 2 Smith’s Leading Cases, Hare & Wallace’s ed. 473-479, where the principal American cases upon the doctrine of estoppel by record are collected and commented on. See also United States Digest, vol. 2, p. 644-647, pi. 155-159 inclusive, 161, 164, 166-168 inclusive, 170, 171, 173, 176-178 inclusive, 180,188, 190, 211, 22-1,191,198, 209,210.

 Le Neve v. Norris, 9 Bro. P. C. 67. Norris v. Le Neve, 3 Atk. 35; Ridgway, 399. Young v. Keightly, 16 Ves. 348, 350. Dexter v. Arnold, 5 Mason, 303. Tilman v. Tilman, 3 J. J. Marshl 118. Livingston v. Hubbs, 3 Johns. Ch. R. 194. Haskel v. Rooul, 1 McCord Chi R. 99; Hollingsworth v. McDonald, 9 Har. & Johns. 930. McCall v. Graham, 1 Hen. 6 Munf. 180. Winston v. Johnson, 9 Munf. 305. Huffacre v. Green, Hayw. 51. Triplett v. Wilson, 6 Gall, 47. That a bill of review does not lie upon discovery of evidence to matters which were'within the party’s knowledge, or which by due diligence he might have ascertained, see more particularly McCracken’s heirs v. Fihley, I Bibb, 455, Talbot v. Todd, 5 Dana,. 197. Bucknor v. Forker’s heirs, 7 id, 50. Harvey v. Murrell, Harper Eq. R. 957. Record evidence being discovered alter a decree, which would have probably changed the decision, a bill of review has been sustained though the same- matter was generally iñ *sue "in the suit. . Geanry’s adm’r v. Thornbérry, 3 Dana, 500.

 By Mr. Justice Radcliff.

 Equity only relieves after a verdict at law, when' effectual cognizance *587 cannot be taken at law, as in complicated accounts, or where a verdict is obtained by fraud, &c., and not where the party omitted to avail himself of his legal defence. 1 Schoales & Lefroy., 205.

 Clinton, S. and Gold, S. were of the same opinion as the Chief Justice: Five of the Senators concurred with Lewis, J. in the opinion that the decree ought to be affirmed, and Spender, S. was for affirming, except as to the order for an issue, and that the cause should be remitted to chancery.
The Reporter regrets that he has not been able to procure the opinions delivered by those who differed from the majority of the court; but they have got into other hands, or are now lost or mislaid.

 The reference to Brown’s Parliamentary Cases are to the first edition. In the second edition, published by Mr. Tomlins, there is a new arrangement of the cases, to which the references to the ■ first edition are not applicable. The difference will be seen in a table annexed to vol. 8 p. 333,