In the matter of Livingston.

———◦•◦———

# COURT OF APPEALS.

In THE MATTER of the petition of MORTIMER LIVINGSTON and HENRY W. LIVINGSTON, infants, by JOHN LIVINGSTON, their guardian, for the removal of DANIEL C. BIRDSALL, from the office of trustee under the trust deed of WILLIAM WINTER.

1. As against the creator of a trust, under a trust deed securing to the grantor the rents, issues and profits of real estate during life, with remainder over, the court will not interfere in behalf of the remainder-men, to give them more than is secured to them by the very terms of the settlement.
2. Those claiming in remainder under such a trust deed, are interested in the management of the trust estate, and may prevent waste, calculated to injure or destroy the estate in remainder; but the creator of the trust is the only person who is interested in the *execution* of the *express trusts* therein mentioned.
3. The statute does not authorize a proceeding *by petition*, at the instance of those entitled in remainder, to remove a trustee of an *express trust* to receive the rents and profits of lands, and apply them to the use of any person, during the life of such person.
4. The statute authorizing any person interested in the execution of express trusts, to apply for the removal of a trustee on petition, was only intended to embrace that class of persons who are immediately interested, and who might be injured by a violation of the trust, or by the insolvency or other incompetency of the trustee.
5. It was erroneous in the court below to entertain a petition for the removal of a trustee, except upon the application of the creator of the trust.

6. Where the evidence tended to show that a deed of trust was obtained by fraud and undue influence, from a person of weak or unsound mind, it was the duty of the court below to dismiss the petition for the removal of the trustee, unless the judge was fully satisfied that the trust deed was the voluntary act of a sane man.

7. Assuming, however, that the grantor was competent to create the trust, and that the deed is valid, the court ought not to remove the trustee against the wishes of the creator of the trust.

8. An order made upon motion in a special proceeding, is not a proper subject for a rehearing.

9. It is questionable whether a rehearing upon the merits, in a special proceeding, can be granted since the Code of Procedure, except upon an appeal to the general term.

10. The power to grant a rehearing cannot be arbitrarily exercised ; and if the judge grants it upon insufficient grounds, it is an error which the appellate court will correct.

11. The practice of one judge rehearing a matter decided by another judge *animadverted;* upon *and condemned,* and held—that it should be prohibited by positive enactment.

12. A settlement made by the guardian of infants, which is clearly just and advantageous to the infants, is binding upon them, and a court of equity will enforce it, if clearly made for their benefit.

13. The practice of amending and ante-dating orders, in a peculiar case, discussed and condemned, and the facts set forth.

14. Where it was evident that an order removing a trustee was not published by the justice until a certain date (*April 12th,* 1865), held, that such order could not take effect prior to that time, by force of another order, made afterwards.

15. Where an order of discontinuance was vacated upon insufficient grounds, the facts discussed, and the order vacating such order reversed, and the order of discontinuance affirmed.

16. An order removing a trustee held appealable, and that upon such appeal the court of appeals will examine the affidavits and evidence, and the whole merits of the determination appealed from.

17. When one judge of the supreme court overrules the decision of another judge, under pretext of a rehearing, upon substantially the same state of facts, and when orders are made, subsequent thereto, by which a valid settlement and final discontinuance of the proceedings were avoided, upon grounds which were not only false in fact, but insufficient in substance ; it involves a principle which affects the administration of justice in this state, and presents a question eminently proper to come before the court of appeals for review.

18· In such a case the court of appeals have power to examine the whole case upon the merits, and to make such order in the premises as it shall deem suitable and proper, in view of all the circumstances.

19. The rules and practice of the courts have been established to protect the rights of parties, and constitute a part of the equitable jurisprudence of this community.

*June Term,* 1866.

On the 27th day of February, 1862, Gabriel Winter died intestate, seized of real estate, situate in New York and Queens counties, of the value of two hundred thousand dol-

lars ($200,000), and personal estate of the value of twenty-five thousand dollars ($25,000), leaving him surviving his widow, Jane Winter (who died April 19th, 1862), and William Winter, his son, and Mortimer Livingston and Henry W. Livingston, his grand-children by his daughter Mary Jane (who died March 29th, 1858), his only heirs.

Letters of administration were taken out May 21st, 1862, by his son William Winter, with whom was joined John Livingston, the father of the above named Mortimer and Henry W. Livingston, who are infants.

All the property and papers belonging to the estate, as well as the business thereof, was taken into the charge and possession of John Livingston; and he proceeded to collect the rents, made the repairs, paid the taxes, made the insurances, and (as he says) exercised general supervision and control over the same, except as to the sum of five thousand eight hundred and seventeen dollars sixteen cents ($5,817.16), belonging to the estate, which was deposited with the United States Trust Company, to be drawn out only on their joint checks.

Afterwards, and on the 20th day of January, 1863, upon the application of John Livingston, as guardian for his children, a *commission " de lunatico inquirendo,"* was issued out of the supreme court, directed to three commissioners to inquire into the alleged unsoundness of mind of William Winter. The commission was duly executed, and a verdict rendered that William Winter was not of unsound mind. Upon application to the court, this verdict was confirmed October 17th, 1863, although two of the commissioners certified that they thought the verdict was erroneous.

Livingston thereupon took measures to obtain a trust deed, still believing (as he says) said William to be wholly incompetent to manage his own affairs, in consequence of his well known weakness of mind and credulity ; and that the only practical mode remaining to secure Willam against want, by saving to his own use his real estate, was by obtaining the execution of a trust deed under the statute. On the fourth day of December, 1863, Livingston delivered to Daniel

C. Birdsall, who had been the attorney of William Winter, an engrossed copy of the proposed trust deed, leaving the name of the proposed trustee a blank. Birdsall returned it unexecuted, and then another was drawn up, making some alterations, and naming Daniel C. Birdsall, as trustee. After Mr. Winter had taken counsel of Judge Edmonds, and on the 23d day of December, 1863, a trust deed was formally executed to Daniel C. Birdsall, as trustee. The circumstances under which it was executed, are noticed more at large in the opinion of the court.

This trust deed, after the formal parts, proceeded as follows: That said William Winter, for and "in consideration of the sum of one dollar," lawful money of the United States, and for settling and granting all his right, title and interest, in and to all and singular, the real estate and property hereinafter mentioned, upon the trusts, and for the purposes hereinafter expressed and declared, hath granted, bargained, sold, aliened, remised, released, conveyed and confirmed, and by these presents doth grant, bargain, sell, alien, remise, release, convey and confirm, unto the said party of the second part, all the claim, right, title and interest of him the said William Winter, of, in and to, the equal undivided half part of the following described real estate (here follows a description of the same), together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, * * * to have and to hold, all and singular, the said herein before granted, mentioned and described real estate and property, with the appurtenances, unto the said party of the second part, his successors and assigns : Upon trust, to receive the rents and profits thereof, and to apply such rents and profits to the use of him, the said William Winter, during the term of his natural life, and upon the death of the said William Winter, to assign, transfer and convey, all and singular, the real estate and property hereinbefore mentioned, described and conveyed, in manner following, that is to say, to the

lawful issue of said William Winter, living at the time of his death, according to the rules prescribed by the statute regulating the descent of real property; and in case of said William Winter dying without leaving him surviving any such lawful issue, then upon the further trust to assign, transfer and convey, all and singular, the said real estate and property, to his nephews now living. Its other provisions are not material.

After the execution of the trust deed, Livingston says that Birdsall proposed to him to permit him to take possession of one-half of the real estate, and on the twenty-ninth of January, 1864, he brought to Livingston for execution, a proposed agreement for that purpose, which Livingston declined on account of his distrust of Birdsall, fearing that the only design of Birdsall was to involve the estate in litigation and expense, and that he would manage in such manner with reference to William Winter, as to deprive him of his property, said Livingston (as he himself says) finally declined to put Birdsall in possession of any such real estate, and declined to join with him in the execution of any lease or leases thereof, so that he is not now (June 4th, 1864), and never has been in possession of said real estate, or of any part thereof, and that Birdsall never has had the management and control of said real estate, and has never paid anything for taxes, insurance or repairs thereon; that on one occasion he paid to a painter the sum of one hundred sixty-seven dollars and fifty cents ($167.50), for account of painting, which Livingston had theretofore caused to be done.

Birdsall being dissatisfied with this condition of things, and having, as he alleges, been refused moneys which properly belonged to him under the deed of trust, on the 30th day of May, 1864, commenced a suit against Livingston's children, in partition, to divide the real estate, and obtained an injunction order restraining Livingston from collecting any of the rents of the said estate.

On the fourth day of June, thereafter, Livingston, as guardian of his infant children, on his petition, papers and

affidavits, obtained from Justice J. F. BARNARD an order to show cause before the special term to be held at chambers in the city of New York, on the thirteenth, why Birdsall should not be removed as trustee, and some other person appointed to execute the trusts therein named.

The order provided that in the meantime, and until the further order of the court, Birdsall should refrain from collecting any of the rents, or in any manner interfering with the trust property.

The hearing was finally set down for the twenty-ninth of June, with leave to serve additional papers until the twenty-fifth. On the first day of July, this petition after a hearing by Justice LEONARD, holding the special term, was denied upon the merits.

Livingston appealed to the general term, but afterwards countermanded his appeal, having on the fifteenth day of July, following, obtained an order from Justice G. G. BARNARD, at a special term, to show cause before the court, at special term, in the city hall, on the third Monday of July, why the petitioners should not have leave to renew their application for the removal of Daniel C. Birdsall from the office of such trustee, under the trust deed of said William Winter, and to apply for the appointment of Daniel Develin, the City Chamberlain of the city of New York, as such trustee.

This motion came on before the same justice, at special term, at the city hall, on the first day of August, and after argument, was granted; and it was further ordered, that such application be heard on the eighth day of August, at eleven o'clock in the forenoon, before the special term to be held at the city hall.

In pursuance of this direction, the application was renewed before the special term then held by Justice JOSEPH F. BARNARD, who took the papers, without rendering a decision at the time.

Prior to the order granting leave to renew the application, a receiver had been appointed in the partition suit, and

neither Livingston or Birdsall were permitted to possess themselves of the rents of the real estate.

On the third of October, 1864, and before any decision had been promulgated by Justice BARNARD upon the second application or re-hearing, the parties came together and effected a settlement.

On that day an agreement was made and entered into, between William Winter of the first part, Daniel C. Birdsall of the second part, and John Livingston, guardian of his children, of the third part, to perfect such settlement, which was duly executed under their respective hands and seals, and which recited that the above named William Winter, Mortimer Livingston and Henry W. Livingston, were heretofore seized in fee simple, as tenants in common, of all the house lots and real estate mentioned in schedules Nos. one and two, hereto annexed, and heretofore owned by Gabriel Winter, their common ancestor, now deceased; and while so seized, the said William Winter made and executed to the above named Daniel C. Birdsall, a deed and conveyance in fee, of his one equal undivided half of his said houses, lots and real estate, in trust (&c., as stated in the trust deed). And, whereas, since the execution of the said deed of trust, the said parties of the first part and second part, have brought an action in the supreme court of the state of New York, against the said John Livingston, Mortimer Livingston and Henry W. Livingston, for the partition among said tenants in common, of said houses, lots and real estate, in which action a receiver of the rents, issues and profits, of said houses, lots and real estate, has been appointed by said supreme court, and which said receiver is now in the receipt of said rents and profits; and whereas, the said houses and lots, and real estate, are so situated that it is best for the interest of all parties concerned, that partition thereof should not now be made, and that the parties interested in the receipt and enjoyment of said rents, issues and profits, should not be subjected to the losses and expenses necessarily consequent upon a receivership of the same, and that each party entitled thereto, should have and enjoy the leas-

ing, care and custody, of his or their portion of said houses, lots and real estate, and the collection and receipt of the rents, issues and profits thereof. And whereas, a mutual compromise and agreement for the settlement and arrangement of all said matters, has been made by and between the said William Winter and the said John Livingston, as guardian as aforesaid (The agreement then proceeded as follows) :

Now, therefore, this agreement witnesseth, that from and after the day of the date hereof, the said Daniel C. Birdsall, as assignee and trustee of William Winter, as aforesaid, shall have and enjoy the exclusive right of letting and leasing the several houses, lots and real estate, particularly mentioned and described in schedule No. 1, to this indenture annexed, and of collecting and receiving the rents, issues and profits thereof.

The agreement then makes a similar provision in favor of Livingston, as to the houses, lots and real estate in schedule No. 2. It then provides that all the leases shall be in their joint names, and that no lease shall be given by either of the parties for a longer term than one year, without the express consent of both in writing, duly acknowledged. Settlements were to be made on the first day of January and July, in each year, when an account was to be rendered, and a balance struck and balance paid, so as to make one's receipts of net proceeds for the half year equal to the others.

Birdsall and Livingston further agreed that each should keep the buildings properly insured at all times, and promptly pay all taxes and water rates on the buildings assigned to them respectively by schedules Nos. one and two, and also should "keep all parts and portions of said premises in proper and suitable repair, and defray all expenses of so doing, but neither, however, to exceed two hundred dollars in any one-half year without the written consent of the other."

The insurance to be effected in their joint names. One party could not interfere in the collection of the rents assigned by said agreement to the other; but each party

In the matter of Livingston.

was to have the exclusive control and management of the premises assigned to him by said agreement, except as therein otherwise provided.

The agreement was to continue in force during the trust, and no action or other proceeding of any kind to obtain any further partition should at any time be prosecuted by either of the parties.

It was made a condition of the said agreement, that Livingston should not at any time thereafter, by suit or proceedings at law, or in any other way interfere with or molest William Winter, or his person, or his residence, or attempt in any way, directly or indirectly, to control or influence, or direct him in respect to his residence, personal movements or expenditures.

And it was mutually covenanted, that except as provided in said agreement, Birdsall and Livingston should not be liable to account to each other, of and concerning the rents and profits of said property, during the life of William Winter, and that neither Birdsall or his successor in the trusteeship, should be 'molested or interfered with, by action or otherwise, by said parties of the third part, except to compel due execution and performance of such agreement.

After this agreement was duly executed and acknowledged by all the parties thereto, and on the same day, a stipulation in writing was entered into, signed by *Daniel C. Birdsall*, trustee, *William Winter* and *John Livingston*, guardian for infant petitioners, and Samuel G. Courtney, attorney for Birdsall and Winter, by which it was agreed by and between all the parties thereto, *that each and any order made in the matter of the application of said infants, by John Livingston, their guardian, for the removal of Daniel C. Birdsall, from the office of trustee, be vacated*, and that an order to that effect might be entered by any of the parties, and *that all the pro. ceedings therein be discontinued*, without costs to any of said parties as against the others, and that an order to that effect might be entered by either party, and that the injunction order granted them on the eighth of August, 1864, be vacated and dissolved.

On the next day, at a special term held before Justice LEONARD, at the city hall, in New York, on filing the stipulation, and on motion of John W. Edmonds, for the petitioners, an order was entered in pursuance of the stipulation, vacating *each and every order in said proceedings, and discontinuing the said proceedings without costs to any of said parties as against the others,* and dissolving the injunction.

Here the matter rested, and the parties went on under their agreement of October third, 1864, until the twelfth day of April, 1865, at which time Justice JOSEPH F. BARNARD published his decision, and an order was entered with the clerk of New York, removing Daniel C. Birdsall as trustee of William Winter, and appointing John B. Haskin in his place and stead, upon his filing a bond in the penalty of twenty thousand dollars ($20,000), with sureties to be approved by a justice of the supreme court.

On the twenty-fourth day of April, 1864, John B. Haskin, having executed the required bond, applied to Justice GEO. G. BARNARD for an order requiring Birdsall to account as trustee, and pass his account before a referee, in the usual manner; upon which occasion the said justice granted an order that said Birdsall show cause before him, at the chambers of the supreme court in the city hall, on the twenty-sixth of April, why such an order should not be made.

On the twenty-sixth of April, the said justice at a special term, granted the order, no one appearing to oppose it. And he further directed, that the tenants of the premises in schedule No. 1, account and pay all the rents to said John B. Haskin, and attorn to him as such trustee.

On the eighth day of May, 1865, Birdsall applied to Justice SUTHERLAND, and obtained an order upon Livingston and John B. Haskin, to show cause before this court, at a special term to be held in the city hall, on the fifteenth day of May then instant, why the order of the twelfth of April, removing him as trustee, should not be vacated and set aside, on the ground that the proceedings in said application had been *settled and discontinued;* also why the above order of the twenty-sixth of April should not be vacated for

In the matter of Livingston.

the same reason; and in the meantime staying the proceedings of Livingston and Haskin, under said orders.

On the next day, May ninth, 1865, John B. Haskin obtained an order from Justice JOSEPH F. BARNARD, dated at Poughkeepsie, requiring Birdsall to show cause before him, at a special term to be held at his chambers in Poughkeepsie, on the thirteenth day of May, then instant, why the caption of the order of April the twelfth, removing "Birdsall as trustee, should not be amended, so as to read the —— day of the actual making thereof, to wit: the —— day of August 1864, *nunc pro tunc*, and stand as the order of the court of the last mentioned date." And on the thirteenth, the said justice, at a special term held at the court house, in Poughkeepsie, granted the motion, and directed the order of April twelfth, 1865, to be "amended, so that the date thereof shall be entered (now for then) as of the last mentioned date, being the date of the rendition of the decision in this matter, and of the making of said order." This order was granted on motion of John B. Haskin, no one appearing to oppose it.

On the twenty-seventh day of May, 1865, on application of John B. Haskin, Justice SUTHERLAND granted an order on Birdsall, to show cause at a special term, in the city hall, New York, on the thirtieth day of May, then instant, *why the order of Justice* LEONARD *discontinuing the proceedings,* bearing date October fourth, 1864, should not be *set aside and vacated.*

On the seventeenth day of June, 1865, Justice SUTHERLAND, at a special term, *denied the motion of Birdsall* to vacate the order of the twelfth of April, as amended by the subsequent order of May thirteenth, whereby said Birdsall was removed as trustee. *He also denied the motion to vacate* the order of April twenty-sixth, whereby Birdsall was directed to state his accounts as such trustee. And on the same day *he granted the motion of Haskin, whereby the order of discontinuance granted by Justice* LEONARD *was directed to be vacated and annulled.* No costs were allowed to either party.

Birdsall and Winter appealed to the general term from the

order of Justice JOSEPH F. BARNARD, of April twelfth, 1865, removing Birdsall as trustee. Also from his order of May thirteenth, 1865, directing his former order to be amended and *entered nunc pro tunc*, as of August thirty-first.

Also from the two orders of Justice SUTHERLAND, of June seventeenth, 1865, one of which denied the motion to vacate the two orders of Justices J. F. and GEO. G. BARNARD, removing Birdsall as trustee, and requiring Birdsall to account to Haskin, as the substituted trustee ; and *the other, of which annulled and vacated the order of discontinuance granted by Justice* LEONARD.

All these appeals were heard at the same general term in New York city, and the order appealed from *affirmed with costs*.

Upon the appeal to this court, an application was made at the March term, in behalf of the appellants, for a stay of proceedings pending the appeal, which was granted, with a direction that in the meantime *William Winter, the beneficial owner of the rents and profits of the trust estate, be allowed to collect the rents for himself*, and with liberty to the respondents to bring on the appeals for argument at the succeeding June term.

The nature and character of the evidence upon the application of the Livingstons to remove Birdsall as trustee, together with the circumstances under which a re-hearing was granted, and the subsequent orders made, so far as they are material, sufficiently appears in the ‘opinion of this court.

> WILLIAM F. ALLEN, *and* ALEXANDER S. JOHNSON, *for appellants.*
> JOHN W. EDMONDS, *for the respondents.*
> JOHN H. REYNOLDS, *for Haskin.*

*By the court,* MORGAN, J. It is important to a proper consideration of the several questions presented by these appeals, to understand the position which the respective parties occupy towards each other, and the equity of each to

invoke the aid of the courts under the trust deed, for the protection of their respective rights.

This trust deed was voluntary on the part of William Winter, securing to himself the rents, issues and profits of a real estate, confessedly worth one hundred thousand dollars ($100,000), during his life, with remainder over to his heirs. And on default of heirs, to his nephews *Mortimer and Henry W. Livingston*. As he had no children, it may perhaps be assumed that the nephews in question take a vested remainder under our statute, which doubtless gives them a standing in court to invoke its aid to protect the *corpus* of the estate from destruction, by the unlawful acts of the tenant for life.

So far as the deed creates a trust in Birdsall, to receive the rents and profits, and apply them to the use of William Winter, during his life, it is expressly authorized by statute (1 *R. S.* 729, § 55). So far as it requires the trustee to assign or convey the legal estate to those who shall be entitled in remainder, under the trust deed, his services will be useless, as the transfer will be made, if at all, by operation of the statute of uses, and his office as trustee will then terminate (4 *R. S.* 730, § 6).

As against William Winter, the creator of the trust, and the beneficial owner of the rents, issues and profits of the legal estate during his life, the court will not, I think, interfere in behalf of his nephews, to give them more than is secured to them by the very terms of the settlement (*Hill on Tr.* 83 ; *Hays* agt. *Kershaw*, 1 *Sandf. Ch. Rep.* 258), although the deed of settlement is silent on the subject, doubtless those claiming in remainder under it are interested in the management of the estate, and the tenant for life owes them certain duties which a court of equity may enforce. A tenant for life, in respect to these duties, stands in the nature of a trustee to the remainder; but this is an implied, and not an express trust (*Joyce* agt. *Gunnels*, 2 *Rich. Eq.* 259).

If the tenant for life is guilty of any species of waste calculated materially to injure or destroy the value of the estate

in remainder, it is perfectly competent, and in truth is the constant practice in this country as well as England, for the remainder-man to resort to the prompt and efficacious remedy by an injunction bill (4 *Kent*, 17).  Upon such a bill a court of equity might require security of the trustee for the due performance of those duties which the law casts upon him in respect to the preservation of the *corpus* of the trust estate.

Since it has become impossible under our statutes (1 *R. S.* 730, § 65), for the trustee in such a cause, to alien or dispose of the real estate to the injury of the remainder-man, there are but few occasions when it can be necessary or proper for the court to interfere with the management of the trust, except on behalf of the beneficial owner for life.

In this case, William Winter, the creator of the trust deed, is the only person who is legally interested in the execution of the *express trusts* therein mentioned.

*There are no express trusts in favor of the petitioners.*  The obligation on the part of the trustee to preserve the *corpus* of the estate for the benefit of those entitled in remainder, does not rest upon any *express trusts,* but is to be implied, if it exists at all.

Keeping in view the relations which these several persons sustain towards each other, I will now proceed to notice the several questions presented by the appeals.

I. It will be seen that *William Winter*, the equitable owner of the estate for life, and who alone is interested in the execution of the trusts mentioned in the deed of trust, is a *party defendant* in these proceedings.  I am not aware of any case where the court has entertained a petition for the removal of a trustee under our statutes, at the instance of those entitled in remainder, and against the wishes of the *cestui que trust,* for life.  Nor do I think the statute intended to authorize such a proceeding.  Section 55 (1 *R. S.* 728), authorizes the creation of an express trust " to receive the rents and profits of lands, and apply them to the use of any person, during the life of such person."

This is such a trust.  Section 70, taken in connection with

section 72, provides that upon the bill or petition of any person *interested* in the execution of an *express trust*, theretofore, authorized, the court of chancery may remove any trustee who shall have violated or threatened to violate his trust, or who shall be insolvent, or who shall for any cause be deemed an unsuitable person to execute the trust.

It was said by the chancellor, in the *Matter of Van Wyck* (1 *Barb. Ch. R.* 565), that independently of these statutory provisions, the court had no power upon a mere petition to discharge a trustee, and that the usual course of proceedings was by bill (*and see Hill on Tr.* 194).

As a general rule, petitions can only be presented in an action already commenced, or in a matter over which the court has jurisdiction, by some act of the legislature or other special authority. Under the English statutes, sundry cases of trusts were provided for, in which a remedy might be had by petition, but the courts uniformly held that the remedy could not be extended by construction, to include other cases. In *ex parte Brown* (*Cooper*, 295), Lord ELDON discharged an order that had been made upon petition, stating that in his opinion, constructive trusts were not within the meaning of the statute.

And in *ex parte Skinner* (2 *Mer.* 453), it was held that the statute was meant to extend only to cases of plain breach of trust committed in their character as trustees. (*And see Hill on Tr.* 193; 3 *Dav. Ch. Pl. and Pr.* 2099).

It is quite certain that our statute authorizing any persons interested in the execution of express trusts, to apply for the removal of the trustee upon petition, was only intended to embrace that class of persons who were immediately interested, and who might be injured by a violation of the trust, or by the insolvency or other incompetency of the trustee.

In this case, I think William Winter was the only person interested in the execution of the trust, within the meaning of the statute, and that it was erroneous for the court below to entertain a petition for the removal of Birdsall from his trust, except upon the application of Winter.

It does not, however, appear that the appellants took any objection of this character; perhaps they should have moved to dismiss the petition, in order to avail themselves of the objection, and it may be too late after litigating the petition upon the merits, to raise such a question. If, however, the court below was without jurisdiction in the first instance, as I am inclined to believe, I think it is not too late to raise the objection, although it is well settled that a stranger could not avail himself of it (*People* agt. *Norton*, 9 *N. Y. R.* 176).

II. If it should be conceded that the proceedings by petition were regular, or that jurisdiction was acquired in consequence of the appellants neglecting to take the objection in time, then it will be necessary to examine into the matter of the petition, before we are prepared to pass upon the other questions raised by the appeal.

It contains a great many things which are quite foreign to the matter in hand, and many of its most important statements rest upon information and suspicion. It contains, however, one statement, which if sustained by the evidence —and I am not prepared to say that it is not—would induce the court to refuse at once to entertain any proceedings to give effect to the trust deed in favor of these respondents, or any other of the parties claiming under it.

It is said in the petition, that William Winter was incompetent to devise real estate.

This is stated by Mr. Livingston in his letter to Judge Edmonds, but a few days before the execution of the trust deed. The petitioners also say " that said William Winter being a person of very weak understanding, and incapable of transacting business, or managing his own affairs; so credulous as to believe the most improbable and absurd statements, and so timid as to be easily frightened into almost any course of action that might be suggested to him; easily alarmed and imposed upon by any designing person— said Birdsall has taken advantage of William's weakness of mind and character, and of his (Birdsall's) own relations as such attorney and trustee toward him, for the purpose of

defrauding, deceiving and misleading him. *That at the time the execution of said trust deed, December twenty-third, 1863, was obtained by Birdsall,* * * * *and for more than a month prior thereto,* he had been acting not only as the agent, attorney and counsel of William, but as his guardian and custodian ; that said Birdsall has abused the confidence reposed in him by William, solely for his own gain and advantage ; that by falsehood, trickery and deceit, he has induced and compelled William to avoid all communication with, and keep away from his own relatives, acquaintances and other advisers, whilst by like fabrications and false statements, has prevented such relatives from calling upon William, he (Birdsall) keeping himself in communication with, and deceiving both parties." * * *

*That the execution of said trust deed was procured by Birdsall through fraud and deceit practiced upon said William,* and upon said Livingston ; and his counsel *Gilead B. Nash* (Livingston's partner), in his affidavit annexed to the petition says : that he "never had any doubt of the fact that said William is a person of unsound mind."

It appears that Livingston himself proposed that Winter should execute a deed of trust, although he preferred somebody besides Birdsall for trustee. He finally assented to have Birdsall's name put in. "This, however," says Mr, Nash, "was a matter of *necessity,* for Mr. Birdsall repeatedly stated both to me and Livingston, that he would not allow William to execute the deed unless it should be made to him."

*William Winter,* however, in his affidavit, states that he executed the trust deed without any compulsion, fraud, duress, threats or misrepresentations of any kind, upon the part of Birdsall or any other person ; and that he is still satisfied with it, and with Birdsall as his trustee ; that he selected Birdsall by his own choice, although Birdsall at the time informed him that he was comparatively speaking a poor man ; that he made inquiries as to Birdsall's character and integrity, and became satisfied, and is still satisfied, that

Birdsall will carry out the said trust deed with faithfulness and honesty.

He further states that he executed the said trust deed, "believing it to be the best thing he could do to get away and be relieved from the annoyance and harrassing of said Livingston, and believing that thereby he could have the quiet and rest from vexation he so much desired to have, and desires." Mr. Birdsall, in his affidavit, states that Livingston urged him to advise William Winter to make a trust deed; that Livingston offered him $2,000 for his trouble, if he would get him to execute such an instrument as he (Livingston) had prepared for him; that Livingston said he did not offer it as a bribe, but that William Winter was very close, and would not pay him (Birdsall) for his services. Birdsall says, he declined this proposition. He says, that Livingston told him frequently, that he (Birdsall) ought to make from two to three thousand dollars a year out of the trust, and that he (Livingston) would not take charge of it for less than that sum.

That in the month of May, 1864, Livingston stated to him that it would be impossible for Birdsall and Livingston to get along together, and it would be better for all parties for Birdsall to resign his trust; that Livingston offered him $5,000 if he would resign, and $5,000 more if he (Birdsall) would get him (Livingston), or some person he (Livingston) would select, appointed trustee, the moment the order for such appointment was entered.

Birdsall says, he declined, whereupon Livingston got angry, and swore he would have him removed, whatever it might cost. · Mr. Livingston in a subsequent affidavit denies that he ever made any offer of the kind.

The case tends very strongly to show that the deed of trust was obtained by fraud and undue influence ; both Livingston and Birdsall co-operating together to induce William Winter to execute it; and as it is expressly charged in the petition that Winter was of unsound mind when it was executed, and that the deed was obtained from him by fraud and undue influence, it was clearly the duty of the court

below to dismiss the petition, unless the judge was fully sat-
isfied that the trust deed was the voluntary act of a sane
man, competent to make it. A court of equity will never
interfere in favor of a party who takes under an instrument
executed by a person who is *non compos*, or when executed
under duress, or under terror or apprehension; nor suffer
them to take effect if they are accompanied by any circum-
stances of imposition or apprehension. (*See Hill on Tr.*
156, *and seq.*)

In order, therefore, to sustain the orders made for the
removal of Birdsall as trustee, and the appointment of Has-
kin to carry out the trusts, the petitioners must of necessity
concede that *William Winter was not only competent to make
the deed of trust, but that it was fairly and voluntarily made*,
when he was neither under duress or restraint. Otherwise
the court would doubtless set it aside on complaint of Wil-
liam Winter, or of his committee.

III. Assuming, however, that William Winter was com-
petent to create the trust, and that the deed is valid, there
is but little left in the case as made out by the petitioners,
upon which to found an order for the removal of Birdsall as
trustee. In my opinion the court ought not to remove him
against the wishes of William Winter, who has an undoubted
right to give away the rents and profits of the trust estate
to whom he pleases, without interference from the petition-
ers. He may, if he pleases, pay Birdsall's debts out of
these same rents and profits, and it is not for Livingston to
prevent him from doing so.

But it is claimed that William Winter is liable to be
imposed upon; that he is an imbecile, and incompetent to
manage for himself; without *undertaking to deny that this
may be in a measure true, what is the result?* It does not
advance the case of the petitioners, or aid in sustaining the
proceedings in the court below. If the court erred in affirm-
ing the verdict of the jury upon the *commission de lunatico
inquirendo*, that error cannot be corrected in these proceed-
ings. From the nature of the evidence tending to establish
the lunacy of William Winter, there is no doubt that if he is

now incompetent to manage his own affairs, he was equally so when he made the deed of trust, and this would lead to a result quite foreign to the expectations of the petitioners who claim under it, as we have already had occasion to notice. Now whether Birdsall is insolvent or not ; whether he is using a portion of the rents and profits for his own benefit, and to pay his debts, in order to relieve himself from insolvency, is a question between him and William Winter, and the creditors of William Winter. When the petitioners state that William Winter's debts are accumulating upon him by the negligence and dishonesty of the trustee, they are interfering with a matter over which they have no control whatever.

It will be time enough for Livingston to make such a complaint when he is constituted one of the committee of the person and estate of William Winter ; and until that time, he has no claim upon the court to interfere with William Winter or his trustee. As yet William Winter has not been pronounced a lunatic or a person of unsound mind, by the judgment of a competent court, and we must, therefore, concede to him the same right we concede to others who are the owners of a large estate—the right *to dispose of it* by gift, grant or devise, to whomsoever he pleases, without being called to account for it in a court of equity, by those who have no legal control over him or his estate. In my opinion, therefore, the order or decree of Justice LEONARD, of July 1, 1864, denying the application of the petitioners, was right. First, upon the ground that the petitioners had no right to apply by petition for Birdsall's removal as trustee ; and secondly, *upon the merits.*

As the *re-hearing* before Justice JOSEPH F. BARNARD, was substantially upon the same state of facts, it may not be necessary to proceed any further in the discussion of these appeals, as we must necessarily come to the conclusion that the subsequent decree removing Birdsall as trustee, and the appointment of Haskin in his place, cannot be sustained upon any theory of the case.

IV. As this is however a very extraordinary case, I will

proceed to notice the proceedings subsequent to the decree of Justice Leonard dismissing the petition. The very statement of the case, with the various orders made by the various judges during its progress to this court, is sufficient to attract our attention, and create some suspicions at least, that the forms of law have been strangely perverted, to accomplish objects which could not have been attained by the regular and orderly administration of justice.

(1.) I will first notice the order for a re-hearing, granted by Justice Geo. G. Barnard at special term. It is called an order *granting leave to the petitioners to renew their application*, but it is doubtless an order for a *re-hearing* of the petition upon the merits, with respect to applications made in an action, they may doubtless be one made by petition as well as by motion, and the practice is the same, whichever form the application takes (1 *Barb. Ch. Pr.* 578).

In relation to special proceedings authorized by the Code, when the remedy may be had by petition under section one, the rules governing ordinary motions do not apply; but instead of obtaining leave to renew the application, the defeated party was required by the former practice of the courts to apply for a re-hearing in the same manner as upon a decree or order (1 *Barb. Ch. Pr.* 353).

An order made upon motion was not a proper subject for re-hearing, but might be discharged by application, by motion to the court. But if the order of Justice G. G. Barnard is treated as an order made on motion, I think it was made in violation of the practice of the court, and certainly in violation of rule twenty-three of the supreme court, which prohibits a second application upon the same state of facts to be made to any other judge than the one who decided the original application.

(2.) It is at least questionable whether a re-hearing upon the merits can be granted since the Code of Procedure, except upon an appeal to the general term. Doubtless the court at special term may at any time within a year, relieve the party from a judgment, order or other proceedings taken against him, through his mistake, inadvertence, surprise or

excusable neglect, upon terms, or grant a new trial in the cases provided for in civil actions, according to the rules and practice of the courts. But there is no provision in the Code that I am aware of, when the trial is by the court, which authorizes an application to the court at special term for a new trial upon the merits. It may be said, however, that by another provision of the Code, in cases left unprovided for, the former practice may be resorted to (§ 468). Certainly the Code has not attempted to regulate the practice in special proceedings, except upon appeals. By the laws of 1854, page 592, certain provisions of the Code are made applicable to special proceedings. That act provides that an appeal may be taken to the general term from the final order of the special term in special proceedings, and that the practice on such appeals shall conform to sections 322, 329, 330 and 332 of the Code. By reference to these sections, it will be seen that the appellate court may, upon such appeal, reverse, affirm or *modify* the order appealed from, and may order a *new trial*. It is doubtful, I think, whether the court at special term can entertain an application for a new trial upon the merits, as that power seems to be vested in the court at general term.

But if the former practice is still in force in respect to rehearings in equity in this state, I am of the opinion that the court below erred in granting a re-hearing in this case. (1.) It was not a case for a re-hearing. A re-hearing will not be granted on account of the discovery of new evidence or new matter, nor because the importance of the testimony has only been ascertained since the decision, nor to obtain accumulative testimony, nor for the purpose of contradicting the adverse parties witnesses (7 *Barb. Ch. Pr.* 354-5, *and cases cited*).

Certainly the power to grant a re-hearing, cannot be arbitrarily exercised ; and if the judge grants it upon insufficient grounds, it is an error which should be, and will be corrected by the appellate court, whenever the question is properly brought before it for review. (2.) But in my opinion there is another grave objection to the order of Justice BARNARD,

granting a re-hearing of the petition, except before the same judge who denied the original application. Chancellor WAL-WORTH, in *Winship* agt. *Pitts* (3 *Paige*, 260), says, that after an application has been made to the vice chancellor in open court, and been denied by him, it is irregular to bring the same question before the chancellor, except by way of appeal, and after a decree has been made by the chancellor, it is not competent for any vice chancellor to make an order or decree which would directly or indirectly discharge, alter or modify the same (*Greenwich Bank* agt. *Loomis*, 2 *Sandf. Ch. R.* 70). Nor will one vice chancellor modify or interfere with a decree made before another vice chancellor (*Astor* agt. *Wood*, 3 *Ed. Ch. R.* 371).

So in England; a cause heard before the chancellor may be re-heard before the chancellor or his successor in office. If it has been before any of the other judges, it may be re-heard before the judge who heard it before, or before the lord chancellor, in which case it is generally termed an appeal, although in fact it is only a re-hearing. When the statute (5 *Vic. C.* 5) created two additional vice chancellors, it was made one of the provisions of the act " that one vice chancellor could not *rehear* any matter in which an order or decree had been made by another vice chancellor " (3 *Dan. Ch. Pl. and Pr.* 16, 17, 18).

Although we have no statute which expressly prohibits one judge from re-hearing a matter decided by another judge, the rule is so well established, and so important, for the protection of parties from unjust vexation, that if it has not already been, it is full time it should be, incorporated into the equity law of this state. (3.) But there is another ground upon which it cannot be permitted, and that is, the doctrine of *res adjudicata*; we have tribunals to whom parties may appeal from an erroneous decision made by a judge at special term, and if parties conceive themselves aggrieved by the decree of one judge, they must take their remedy by appeal instead of applying to another judge to re-hear therir complaints.

VI. I will now examine into the validity of the orders

made by Justice J. F. BARNARD, upon the re-hearing, by which Haskin was substituted trustee in the place of Birdsall, as well as the subsequent orders made to carry that order into effect. If, as I have already attempted to show, the order of Justice LEONARD was right, it follows that the subsequent order of Justice BARNARD cannot be sustained, for it was made upon substantially the same state of facts. But it is unnecessary to rest the case here, *for pending these proceedings before Justice J. F. BARNARD, upon the re-hearing, the parties entered into a valid and binding agreement, by which the controversy was settled;* a settlement which was clearly just and advantageous to all the parties. This settlement, if the trust is valid, ought to receive the sanction of a court of equity, and should be enforced against all the parties. It was suggested on the argument that the settlement was not binding upon the petitioners, because they are infants, but a court of equity will enforce it, if it is made for their benefit, as this clearly was. (*Rogers* agt. *Cruger*, 7 *Johns. Ch. R.* 557 ; *Scovill's Case, Moseley,* 224.)

It was, therefore, right and proper that the proceedings should be discontinued, as they were, by an order of the supreme court at special term, upon the stipulation of all the parties. This order was made before Justice LEONARD, upon the basis of the settlement, and it in terms vacated all the orders which had been heretofore entered in the proceedings. Notwithstanding the settlement and a formal discontinuance of the proceedings, Justice JOSEPH F. BARNARD, subsequent thereto, and on the twelfth day of April, 1865, made an order on the re-hearing, removing Birdsall as trustee, and appointing John B. Haskin in his place. On application of Mr. Haskin, he afterwards made another order at Poughkeepsie, directing his order of the twelfth of April, 1865, to be entered as of the thirty-first of August, 1864. It is not to be disguised that the object of this last order was to overreach the settlement. It was founded upon the affidavits of Mr. Haskin and the clerk of the court. Mr. Haskin swore that he had the original memorandum order of Justice BARNARD, as follows : "The —— day of ——

1864," and that "the erasure of figure four in the year, and the insertion of April twelve, 1865, was an error of the clerk, and such order should be corrected and entered as of August or September, 1864." The clerk swore that about a week or two after the re-hearing in August, the papers came to him from Justice BARNARD by express, and that subsequently he received the decisions written on some of the affidavits used on the motion, which was found in the judge's private room. He also swore that the papers were received and said order made as early as August, 1864. That all this was substantially false in every important particular, plainly appears by the affidavits of the clerk and others, subsequently made and used upon the motion of Birdsall to set aside the order. The clerk then swore that the order of the twelfth April, 1865, *was on that day given to him by Justice* GEO. G. BARNARD, on which day he filed all of the papers in this matter, together with said order, and marked the whole of them ; and that he received the *memorandum of the decision before referred to, subsequent thereto, and several days thereafter ;* that he did not find it in the judge's private room, *but the same was handed to him in the latter part of April.* He further states that his former affidavit was made under a misapprehension. But this is not all. Birdsall states in his affidavit, and in this he is corroborated by Herman Fox, that on the eighteenth of April, 1865, he examined the papers on file, and *the memorandum in question was not then on the paper* on which it was subsequently found to be indorsed. These facts were not contradicted before Justice SUTHERLAND, on the part of Haskin or Livingston. I think, therefore, it is quite apparent that the order of Justice JOSEPH F. BARNARD, ante-dating his order of removal to August 31, 1864, was made under an entire misapprehension of the facts, and so far as Haskin is concerned, must be regarded as a fraud upon the court. But whether the order was fraudulently obtained or not, the fact is put beyond doubt by the affidavit of the clerk *that no order was published* by Justice JOSEPH F. BARNARD, removing Birdsall as trustee, until the twelfth of April, 1865. It could not take effect

prior to that time by force of another order made afterwards. There is another order which claims our attention, granted upon the motion of Mr. Haskin, by Justice SUTHERLAND at special term, setting aside the order of Justice LEONARD, already referred to, discontinuing the proceedings. This order was made at the same time that the judge denied the motion to set aside the order of April twelfth, for the reason doubtless that it was regarded as an obstacle in the way of Haskin's getting possession of the trust property under the order of April twelfth.

The reasons of Justice SUTHERLAND for setting aside the settlement of October third, 1864, are not given in the case, but grounds upon which the application was made, deserve attention. Mr. Haskin states in his affidavit that Birdsall pretended that the proceedings in the matter of the petition were discontinued, but that " as he is informed by Livingston, and verily believes to be true, the said Birdsall obtained his signature to the said stipulation and agreement of the third of October, by falsely and fraudulently pretending and representing to said Livingston that the motion argued herein for Birdsall's removal, on the twenty-third, twenty-fourth and twenty-fifth days of August, before the Hon. J. F. BARNARD, had been denied, and by other false representations and pretences." Birdsall, however, in his affidavit denies this, and states further, that " on the thirtieth day of May he called on Livingston and showed him Haskin's affidavit, and that Livingston then told him that all of said affidavit in relation to what Haskin alleges, was said to him by Livingston, as herein referred to, is false and untrue." Mr. Livingston did not make an affidavit in the matter, but it appeared by the affidavits of Mr. Courtney, as well as that of Mr. Birdsall, that the settlement was fairly made by the mutual consent of all the parties interested.

Mr. Haskin, who swore only on information and belief, is not corroborated in his statement that the settlement was made under any misapprehension whatever. Surely the court would not set aside the settlement and stipulation, for

fraud, when the party who is alleged to have been defrauded does not complain of it.

There are many other things which might be noticed, tending to reflect upon the character of the proceedings under review, but the facts already referred to are sufficient, I think, to enable the court to dispose of these appeals.

VII. It is claimed, however, that no appeal will lie in this case, or that at least that this court will not review the order removing Birdsall as trustee, as it rests in the discretion of the supreme court, and is not subject to review in this court. As I have already stated, an appeal is given by the laws of 1854, page 592, section 1. By section 330 of the Code, which is made applicable to such appeals, this court may reverse, affirm or modify the order appealed from, and may order a new trial. The orders appealed from also affect a substantial right made in a special proceeding, under section 1 of the Code, and for that reason are appealed as such to this court (*Hyatt* agt. *Seely,* 11 *N. Y. R.* 52).

No provision having been made by the Code for a finding of facts in such a case, this court is necessarily required to examine the affidavits and evidence upon which the case was decided; an unrestricted appeal takes along with it the whole merits of the determination appealed from (*Bills* agt. *Voorhees,* 20 *N. Y. R.* 528).

It may be true, as was said in *Rogers* agt. *Hosack, Ex.* (18 *W. R.* 329, 330), that the court of appeals will not interfere to regulate the discretion of a court of equity, when the statute has vested that court with power to remove a trustee for a particular cause, but I think such a principle is not applicable to this case.

Upon the application of William Winter to remove Birdsall for insolvency, the evidence in this case is such that this court would not feel authorized to interfere with the decision of the court, whatever its determination might be; but when the court undertakes to act upon the application of third persons claiming in remainder, who have no immediate interest in Birdsall's insolvency, the question assumes another aspect, and when one judge overrules the decision of another

judge, under pretext of a re-hearing, upon substantially the same state of facts, it involves a principle which affects the administration of justice in this state, and presents a question eminently proper to come before this court for review.

And so in reference to the orders made subsequent thereto, by which a valid settlement and final discontinuance of the proceedings were avoided, upon grounds which were not only false in fact, but insufficient in substance.

Although no appeal was taken from the order of Justice G. G. BARNARD, ordering a re-hearing of the petition, it is necessarily connected with the final order of Justice J. F. BARNARD, upon such re-hearing, which in effect reversed the previous order of Justice LEONARD, and its validity is doubtless involved in the principal appeal from the final order of Justice J. F. BARNARD, removing Birdsall as trustee, and appointing Haskin in his place.

I have no doubt as to our power to examine the whole case upon the merits, and to make such order in the premises as we shall deem suitable and proper, in view of all the circumstances. This being a proceeding in equity, we may not only reverse, but if necessary, make such final order or decree in the premises as justice may require. (2 *R. S:* 167, § 27; *Laws of* 1847, *ch.* 280, § 8; *LeGuer* agt. *Govertneur,* 1 *Johns. Ch.* 436, · 499; *Forrest* agt. *Forrest,* 25 *N. Y. R.* 501.)

I have already said enough as to the character of these proceedings to justify us in reversing the orders appealed from on account of their departure from the rules and practice of the court. These rules of practice have been established to protect the rights of parties, and constitute a part of the equitable jurisprudence of this as well as every other civilized community.

But if we look only at the merits of the case, it is impossible to sustain the proceedings. No reason can be assigned for superseding the deed of settlement of October 3, 1864. If the trust deed is to stand, there could be no more proper arrangement made for securing the rights of all the parties, and the preservation of the *trust estate.* If we lay out of

view the insufficiency of the evidence upon which the deed
of settlement was overreached by order of Justice SUTHER-
LAND, there is no ground upon which the court could pro-
perly make such an order upon the motion of Mr. Haskin.
He had no interest whatever in the original controversy,
and his subsequent appointment as trustee did not give him
any standing in court to interfere with the prior proceedings.
He was merely a volunteer, and yet we find that the court
acted solely upon his motion in granting the application
which in effect overreached a settlement of the entire con-
troversy, mutually beneficial and satisfactory to all the par-
ties.

I would, therefore, advise that all the orders appealed from
be reversed, and that the order of Justice LEONARD, made
at special term, October 4, 1864, by which the proceedings
were discontinued, without costs to either party, be affirmed.
This will leave the parties to go on under the deed of settle-
ment made and signed by all the parties October 3, 1864.

Although the case furnishes strong grounds for setting
aside the trust deed, that question is not properly before us.
As to the costs, we may award them at our own discretion
(*Laws* 1854, *p.* 592, § 3).    I think the respondents should be
charged with the costs of all the proceedings taken by them
after the settlement of October 3, 1864, together with the
costs of the appeals in this court.

All concur.