[Filed December 19, 1887.]

# D. W. APPLEGATE, APPELLANT, *v.* B. F. DOWELL, RESPONDENT.

DECREE—OWNER OF LAND, WHEN NOT AFFECTED BY.—In a suit to quiet title, the plaintiff showed possession for the time limited by law for the commencement of actions to recover real estate, and also a regular deed thereto. *Held,* that a decree rendered against his grantor, subsequent to his purchase of the land, declaring the said grantor's deed fraudulent, where there was no issue upon the point in the suit in which the decree was rendered, did not estop the plaintiff from claiming title to the land.

UNITED STATES COURT—JURISDICTION OF.—United States courts in equity and common-law cases are courts of *limited* although *not inferior* jurisdiction, and some especial grounds of jurisdiction must be shown to enable them to take cognizance of causes, and the facts set out as the ground of jurisdiction will be presumed to be the only source from which such jurisdiction is derived.

SAME.—Consent of parties does not invest the court with jurisdiction. The law must confer it, or it does not exist in the court.

SAME.—In a suit between citizens of the same State to set aside a deed as fraudulent, and subject land in the State to a judgment of the State courts, an allegation of fraud upon the revenue laws of the United States does not show a cause cognizable in the federal courts under the laws of the United States.

DECREE OF COLLATERAL ATTACK UPON.—The courts of the United States being courts of superior jurisdiction, their decrees are not open to collateral attack, unless it is affirmatively shown by the record that they had no jurisdiction.

APPEAL from Douglas County.    Reversed.

*Williams & Williams,* for Appellant.

*J. F. Watson,* for Respondent.

THAYER, J.—This appeal comes here from a decree of the Circuit Court for the county of Douglas. The appellant commenced a suit in that court to remove a cloud from his title to 40 acres of land, which he alleged in his complaint that he is

the owner of in fee-simple, and in possession of. The land was a part of the donation land claim of Jesse Applegate in said county of Douglas. The respondent denied in the answer the appellant's ownership of the land, and claimed ownership thereof in himself, under a decree recovered by him against the said Jesse Applegate, the appellant, and others, on or about the fifth day of January, 1883, in a suit in the United States Circuit Court for the district of Oregon, and a deed executed to him in pursuance of such decree by the master of chancery of said court, alleging that said land was included in a certain tract of land, consisting of 121.55 acres, which was found in said suit by said United States court to belong to the said Jesse Applegate, and subject to the payment of a certain judgment in favor of the respondent and against said Jesse Applegate. The appellant filed a reply to the respondent's answer, in which he denied that the title to said 40-acre tract, or any part of it, was in issue in the suit in said United States Court; denied that said last-mentioned court had any jurisdiction in said suit to render such decree, or that said master in chancery had any power to sell said land. Upon the hearing of the case in the court below the appellant, to maintain his cause, gave in evidence a deed to said 40-acre tract, executed to him by William H. H. Applegate and wife on the eighth day of October, 1874, which purported to convey to him said last-named tract. The deed was duly executed and acknowledged so as to entitle it to record, and was duly recorded in the office of the clerk of the county of Douglas, on the thirty-first day of October, 1874, in the record of deeds in said office. And it appears to have been conceded on the part of the respondent that at the time of its execution the said William H. H. Applegate held a deed from said Jesse Applegate to certain lands, which included said 40 acres, and that the same was a part of said Jesse Applegate's donation claim before referred to.

The respondent, to sustain the issues on his part, gave in evidence a duly certified copy of an amended and supplemental bill, filed in said United States Court in said suit on the twelfth day of September, 1881, in which the respondent was complainant,

and the said Jesse Applegate, William H. H. Applegate, the appellant, and others were defendants; also of an answer to said bill filed in said suit by the appellant; and also of the decree of the court therein, and of the deed executed to him by said master in chancery. Said deed bears date December 6, 1883. The appellant's counsel objected to the admission of said evidence upon the grounds of irrelevancy and immaterialty, which objection the court overruled, and the appellant's counsel excepted to the ruling.

The main issue between the parties is the ownership of the 40 acres of land in suit. The appellant, I would infer, was in possession of the land at the time the suit was commenced, as his allegation of possession is not denied in the respondent's answer; and it was admitted at the hearing that he paid full value for it upon the purchase thereof referred to. The Circuit Court failed to make any findings of facts and law as required by section 393 of the Civil Code, as amended in 1885, and the counsel on either side have presented only a cursory view of the matter, and the briefs they have submitted contain but a meager statement of it. The court is left, therefore, to search through the various documents referred to in order to find out what is in the case.

The bill filed in the suit in the United States court states substantially that the respondent and the said Jesse Applegate became co-sureties to the State of Oregon in 1862, and also in 1866, upon the official bond of Samuel E. May as secretary of State, who was elected to said office for two successive terms in said years; that May became a defaulter upon the bonds, and judgments were recovered in favor of the State and against the sureties upon each of them some time in 1874; that one of said judgments was for $8,929.85, besides costs and disbursements, and a transcript thereof was filed and the judgment was docketed in the office of the clerk of the county of Douglas on the eleventh day of August, 1874; that prior to the twenty-seventh day of June, 1878, the respondent paid on said last-mentioned judgment $10,837.75, and on said day recovered a judgment against said Jesse Applegate as his co-surety on said payments

for the sum of $4,882.19, which was on the same day entered
on the judgment-lien docket of said county of Douglas; that
respondent, on the sixteenth day of November, 1878, paid on
the said judgment $1,385.61, the balance due thereon, and gave
due notice that he claimed the benefit of it against said Apple-
gate, and became subrogated to the rights of the State in refer-
ence thereto, upon which he caused an execution to be issued,
and collected the larger part thereof; that the amount of his
claim against said Applegate, arising out of said affairs, was, on
the first day of January, 1881, $6,584.09; that said Jesse
Applegate, in 1849, took the said donation land claim under the
Donation Act of September 27, 1850, which is claim No. 38,
notification No. 54, certificate No. 103, T. 22 S., R. 5 W.,
W. M., and contains 642 acres; that he perfected title thereto,
the north half to himself, and the south half to his wife, Cynthia
Ann Applegate. He also acquired other lands situated in said
county of Douglas, and which are described in the said bill.
That said Applegate and wife, with intent to delay, cheat, and
defraud the State of Oregon and the respondent out of said
debts, deeded all of said lands to their children as follows: To
said William H. H. Applegate, their son, 160 acres of the north
half of said donation land claim, by deed dated the sixth day of
April, 1867, for the apparent consideration of $500; also 80
acres of said donation land claim, by deed dated the nineteenth
day of April, 1869, for the apparent consideration of one dollar,
which deeds were recorded in the office of the clerk of said
county, the first one, the sixth day of February, 1869, and the
second one, the fourth day of May, 1869. To the appellant,
their son, 160 acres of the Jesse Applegate part of said donation
land claim, by deed dated April 6, 1867, for the apparent con-
sideration of $500, which deed was recorded in said last-men-
tioned office the sixth day of February, 1869; also 80 acres of
said donation land claim, for the apparent consideration of one
dollar, which was recorded in said office May 5, 1869. To
Charles Putman, a grandson of Jesse Applegate and wife, a
tract of land outside of the donation claim. To Peter Apple-
gate, their son, 211.31 acres of land, 170 acres of which was a

part of the said donation land claim; also to Sallie Applegate another tract of land outside of the donation land claim.

The bill charges that said deeds were illegally recorded; that each and all of the grantees received them with the intent before mentioned; that each and all of them had notice that said Jesse Applegate was largely indebted to the State of Oregon as the security of May on said bond at the time each deed was made and delivered, and that they well knew that the deeds would make the grantor, Jesse Applegate, insolvent; that the deeds to William H. H. Applegate and to appellant, dated 1867, were antedated, for the purpose to deceive, cheat, etc.; that the pretended money consideration in each was inadequate, and that neither of the grantees paid any money for the land described in said deeds. It is also alleged in said bill that on the seventeenth day of September, 1879, an execution was issued on respondent's judgment against Jesse Applegate to the sheriff of Jackson County, and that it was since returned unsatisfied; and that on the seventh day of October, 1879, an execution thereon was duly issued to the sheriff of Douglas County, and had been since returned unsatisfied; also that on the twenty-fourth day of June, 1871, the said William H. H. Applegate deeded 200 acres of the north half of said donation land claim to Charles and John C. Drain, for the sum of $2,000, cash, and that this deed was also illegal, fraudulent, and void; that the actual price paid was $2,000, yet the deed, to conceal the value of the land and to cheat and defraud the creditors, etc., expressed on its face the consideration of $500 only, and in place of having a revenue stamp of two dollars, as was required by the act of Congress at the date of said deed, only had a revenue stamp of fifty cents; "that each and all of said deeds to William H. H. Applegate, to the appellant, and to the other grantees before mentioned, were illegal, and a fraud under the statutes of the United States, entitled 'An act to provide internal revenue to support the government, and to pay interest on the public debt,' approved thirtieth day of June, 1864, and the amendments thereto; that an inadequate consideration was expressed in each of said deeds by the grantors and grantees, with the intent of evading the provisions of

said statute; that the grantors and grantees well knew that the land conveyed by each deed was at the date thereof worth in cash more than $10,000, and each of them have a revenue stamp on them of fifty cents and no more, not one half the amount required by said act of Congress; and the recording of each of them was in violation of the spirit meaning of sections 152, 156, and 158 of said statute; that none of said stamps have been canceled by writing the date when the deed was so used or stamps affixed on the same, and that none of them have the initials of the person using them or affixing the same prior to the placing said deeds on the records of Douglas County, in the State of Oregon."

The allegation in reference to affixing the revenue stamps upon the deeds, their inadequacy, and the neglect to cancel them before the recording of the deeds, were evidently made in order to give the United States court jurisdiction of the suit. The bill in fact shows upon its face that said court would have had no jurisdiction of it in the absence of such allegations, as it contains in the outset an express statement that all the parties to the suit were citizens of the State of Oregon. Whether such allegations made such a case as would entitle the United States court to assume jurisdiction of the subject-matter involved in said suit will be referred to hereafter. The foregoing facts are the main features of the amended bill. The supplemental bill merely sets forth some changes that occurred in regard to the affairs of the parties after the filing of the amended bill, which need not be considered.

I find nothing material to this case in the appellant's answer to said bill; it purports to be his separate answer thereto, and the statement to that effect is in the usual form laid down in equity precedents. Many of the matters stated in the bill are admitted in the answer. The appellant denied the fraudulent intent charged in the bill against Jesse Applegate and wife in making the deeds referred to therein, or in deeding to appellant the 160 acres of land by the deed of the 6th of April, 1867; denied that said deed conveyed, or purported to convey, any part of Jesse Applegate's half of said donation land claim, or

that the consideration therein named was an apparent consideration; but alleged that the whole of said land conveyed by both of the deeds from Jesse Applegate and wife to him was in the southeast part of the wife's half, except a small piece which lay south of said claim, and that said deeds were made and delivered to him for a good, valuable, and sufficient consideration, which is specified in the answer. And the appellant denied all the fraud charged against him in the said bill, or relating to his receiving and recording the deeds executed to him, or their effect upon the solvency of said Jesse Applegate, or that he was insolvent in consequence of the making and delivery of said deeds, or that the deeds were illegal or fraudulent, or a fraud under the statutes of the United States, or any statute relating to the the internal revenue, and all the matters connected therewith charged in the bill; and averred that the deeds were executed to him, and that he received them in good faith. It will be seen from an inspection of the said decree that the said United States court adjudged that Jesse Applegate became indebted to the respondent in the manner and to the extent substantially as alleged in the bill; that the latter thereby acquired a lien to the amount of such indebtedness upon all the real property of said Jesse Applegate situate in said county of Douglas, from and since the entry and docketing of the judgments mentioned and set forth in said bill; also that on and prior to April 19th, 1869, said Jesse Applegate was the owner in fee-simple of 121.55 acres of the north one half of said donation land claim, the said 121.55 acres being, as stated in said decree, the whole of said north half of said claim, except the portion, 200 acres, more or less, conveyed by William H. H. Applegate on June 24th, 1871, to Charles and John C Drain. That it was adjudged therein that the conveyance of said 121.55 acres by Jesse Applegate to his sons, William H. H. Applegate and Daniel W. Applegate, by deeds dated April 19 and 20, 1869, respectively, was voluntary and without a valuable consideration, and in fraud of the rights of the respondent, and was, therefore, as against him and his assigns, declared to be null and void; that it was also adjudged in the said decree, that the several

conveyances to Peter Applegate, and to the daughter, Sallie Applegate, stood in the same condition, and were also held to be null and void to the same extent; and that it was decreed therein that unless said Jesse Applegate, Daniel W., William H. H., Peter, and Sallie Applegate pay the amount of the indebtedness to the respondent, with costs, etc., within twenty days from the entry of the decree, that the master of the court was authorized and required to sell as upon execution all the interest of said Jesse Applegate on January 1, 1869, in certain pieces of land, viz., the 121.55 acres of the north half of said donation land claim, and all the south half of said claim except the 140 acres, more or less, conveyed, the decree states, by Jesse Applegate to said Daniel W. Applegate, and the portions deeded to said Peter and Sallie Applegate. And that it was further adjudged and decreed therein and thereby, that the conveyance by Jesse Applegate to William H. H. Applegate, on April 6, 1867, of 160 acres, more or less, in the north half of said donation claim, and the conveyance by him to his son, Daniel W. Applegate, appellant herein, of the same date, of 146 acres, more or less, in the south half of said claim, were made in good faith, etc. It will also be observed by an inspection of the said deed from the master to the respondent that the provision of the decree, authorizing and directing him to make the sale of the said interest of Jesse Applegate, was executed.

From these various facts we have to determine the status of the title to the 40 acres of land in dispute. The suit herein was commenced on the seventeenth day of August, 1886, and when the appellant introduced his deed from said William H. H. Applegate in evidence at the hearing, he made out under the issues in the suit a *prima facie* case. At that stage of the proceeding he was presumably entitled to the relief claimed. He was in possession of the land under an absolute deed of title, which had been executed to him and recorded in the office of the clerk of the county in which the land is situated more than eleven years; and the respondent was claiming it adversely to him. In order to defeat such recovery, it devolved upon the respondent to prove that appellant had acquired no title to the

land, or that he had aliened it, or, in some legal manner, had been divested of it. And for that purpose the respondent introduced in evidence the said decree of the said United States court, and other proceedings connected therewith. Whether that evidence was effectual for the purpose depends upon the two questions already alluded to, viz.: *First*, whether the said decree operated upon or affected the appellant's title derived under the deed from William H. H. Applegate of October 8, 1874; and *second*, whether the said United States court had jurisdiction of the suit in which the said decree was rendered.

It is very difficult to determine from the *data* before us when or how Jesse Applegate disposed of, or attempted to dispose of, the 40 acres of land in question. It is alleged in said bill that he and his wife deeded to said William H. H. Applegate 160 acres of the north half of the said donation claim, by deed dated April 6, 1867; also 80 acres of said donation claim, by deed dated April 19, 1869. These two parcels constitute all the land shown by the said bill to have been conveyed to said William H. H. Applegate. It is not stated in the bill in which half of the claim the said 80 acres are situated, but as said William H. H. Applegate deeded 200 acres in the north half of the claim to the Drains, and the 40 acres, also in said half of the claim, to the appellant, which correspond in acreage to the 160-acre parcel and the 80-acre parcel, it is evident that the latter parcel is situated in said north half also, and that the said 40 acres must have been deeded by Jesse Applegate and wife to William H. H. Applegate by one of the said deeds referred to. Nor is this view inconsistent with the inferential statement in the decree, that Jesse Applegate conveyed said 121.55 acres to his sons, William H. H. Applegate and Daniel W. Applegate, by deed dated April 19 and 20, 1869. It will not be presumed that Daniel W. Applegate purchased of William H. H. Applegate, land, and paid him the full value therefor, which he already had a deed to from the latter's grantor. The decree, then, only operated upon the conveyance from Jesse Applegate to William H. H. Applegate long after the latter had conveyed the land to the appellant, and whether that affected the title in the appel-

lant's hands is the question for determination. The deed to William H. H. Applegate was not void, conceding it to have been a conveyance made with intent to hinder, delay, or defraud creditors, although the statute declares that such conveyances shall be void. It was good as between the parties, and as to every one except creditors, and they can only treat it as void in a proceeding to collect their debts. A sale of the property to a *bona fide* purchaser for value will cut off their claim and pass a good title. (Wait on Fraudulent Conveyances and Creditors' Bills, §§ 409, n. 1, 445.)

It was claimed on the argument by the respondent's counsel that it was the duty of the appellant to have interposed a plea in the suit in the United States court that he was such a purchaser, if he claims to have been such, and that his failure to do so estops him from setting up any claim of title to the land. The suit in the United States court was in the nature of a creditor's bill. Its object was to subject certain property Jesse Applegate had conveyed to his children to the payment of a debt he was owing to the respondent. It was to ascertain the intent of said Applegate in making the conveyances, and if found to be fraudulent, to direct a sale of the property and application of the proceeds to the payment of the debt. The conveyances were to the several parties, and were separate transactions in the main, though probably not to such an extent as to require separate suits to be brought against each. The bill under the rule laid down in *Fellows* v. *Fellows*, 4 Cowen, 682, may not have been objectionable upon the ground of multifariousness, and yet the appellant was not required to answer any matter charged against any of the other defendants in the suit, and there was no charge against him regarding the purchase of the said 40 acres of land. The said Jesse Applegate was charged in the bill with having conveyed it, with other lands, to said William H. H. Applegate, with intent to delay, etc., his creditors, and the latter was charged with having accepted the conveyance under circumstances that might cast suspicion upon his good faith in the affair.

The difficulty in the case arises from the fact that the complainant in the bill treated the land as being held by said Wil-

liam H. H. Applegate, under a deed from said Jesse Applegate, and only sought to have that deed annulled; when in fact the former had long prior thereto conveyed the land for an adequate consideration to appellant, by a deed that at the time of the filing of the bill had been standing upon the records of Douglas County for nearly seven years; and the appellant was probably in possession of the land at that time. Was the latter, then, bound by the decree? He might have been, possibly, if the conveyance to him had been a secret one, and he would not, unquestionably, if he had not been made a party to the suit. But was he a party to the suit for the purpose of affecting the transaction of his purchasing the land from his brother in 1874? All the defendants in the bill were made parties in order to prevent a multiplicity of suits. As between them, respectively, and the complainant, except as to some common matter, if there were any such, the suit might be regarded, it seems to me, the same as though it had been brought against them separately. The complainant could have had the sale from William H. H. Applegate to the appellant inquired into, the same as he did the sale from the former to the Drains. He could have charged the parties with bad faith in the affair, and if it had been sustained, have been relieved from its effect; but he did not seek to do that. He contented himself with impeaching the deed from Jesse Applegate to William H. H. Applegate, and left the other in *statu quo.* It was his duty to ascertain whether or not William H. H. Applegate had conveyed away the land, and if so, have had the transaction inquired into, if he desired to question it; as the appellant's counsel very pithily expresses it in his brief, " it was Dowell's business to see that the holder of the legal title was sued, and not the business of the holder of the legal title to see that Dowell sued the proper person."

The decree itself only binds the parties to the suit, and concludes them no further than the issue determined therein. It does not bind them as to matters which were not in issue in the case. If the validity of the said deed from William H. H. Applegate to appellant had been made an issue in the suit, the decree would have been conclusive upon the question; but it

would had to have been directly in issue, and not merely collaterally litigated. "It must be a fact immediately found according to the pleadings, not that on which the verdict was merely based, *a fact in issue as distinct from a fact in controversy.*" (*Glenn* v. *Savage,* 14 Or. 573.)

The difference between the effect of a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand, and its effect as an estoppel in another action between the same parties, upon a different claim or cause of action, is often overlooked. And it is from that circumstance that attorneys and courts have frequently been misled by the rule laid down in *Le Guen* v. *Gouverneur,* 1 Johns. Cas. 436, to the effect that the judgment of a court of competent jurisdiction is not only conclusive as to all questions actually decided; but as to all which the parties might have litigated and had decided therein. Judge Field in *Cromwell* v. *County of Sacramento,* 94 U. S. 351, has pointed out the distinctions referred to, with his accustomed clearness and accuracy. It amounts simply to this, that if the second action is upon the same claim, the former judgment, if upon the merits, will constitute a complete bar, not only as to every matter that was brought in to defeat the claim in the former action, but as to every other matter that would have been admissible for that purpose. If, however, the second action is upon a different claim, the former judgment will only operate as an estoppel against the matters actually litigated therein. In that case it concludes only those facts that were directly in issue in that action. The inquiry in the latter case, Judge Fields says, "must always be as to the point or question actually litigated and determined in the original action, not what might have been thus litigated and determined; only upon such matters is the judgment conclusive in another action." The case here clearly belongs to the latter class, and the decree in the United States court, conceding its validity, does not conclude the appellant from asserting title to the 40 acres of land in controversy.

The view we have taken of the first one of the questions before mentioned renders it unnecessary to consider the second. But

the matter is of too much public interest, I think, to be passed over without observation. Parties to a litigation in this State have often been desirous of having it adjudicated upon in the federal courts. A preference in favor of those tribunals on account of the learning and ability of the judges who preside over them is very proper. It must, however, be borne in mind that the jurisdiction of the United States courts in equity and common-law cases is limited, although they are not inferior courts. That it is necessary to show in the outset, when a case of that character is sought to be commenced therein, some especial grounds of jurisdiction over it before they are authorized to assume the right to decide the matter submitted, and that the facts set out as the ground of jurisdiction will be presumed to be the only source from which it is derived. When, therefore, the facts upon which it is claimed are *not sufficient to confer* jurisdiction, it cannot attach; nor will it matter if the parties, as they often do, consent to the courts exercising it under such circumstances. Consent will not confer jurisdiction over the subject-matter in any case. The law must give it, otherwise it cannot be acquired. Nor will the decision of the court that it has jurisdiction avail where facts are required to be shown as a condition of its exercise, unless they legally tend to establish a case conferring it. No court can obtain jurisdiction by arbitrarily deciding that it has it. I am induced to make these suggestions, for the reason that it is a very unpleasant and extremely delicate duty to be required to pass upon the authority of another court to adjudicate an important matter. And there should never be occasion for it where it can possibly be avoided.

The only grounds, as before observed, upon which it can be claimed that the Circuit Court of the United States for the district of Oregon had jurisdiction of the suit of *Dowell* v. *Applegate*, in which the said decree was given, were the allegations in reference to the insufficiency of the revenue stamps upon the deeds, executed by Jesse Applegate and wife to their children, and by William H. H. Applegate to Charles and John C. Drain. The bill filed therein stated expressly that all the parties were citizens of the State of Oregon. The proceeding was to enforce

the payment of the judgments recovered in the State courts of the State of Oregon, growing out of a defalcation of one of its State officers. It was a suit to reach property that the plaintiff, in one of the judgments, and who had been subrogated to the rights of the plaintiff in the other, had been unable to reach by the ordinary process of execution issued out of the State court. The jurisdiction of the said United States court was invoked as auxiliary to the process of the State courts, and the federal question involved in the case, if it deserves to be considered as such, was not regarded of sufficient importance to receive from the court in the opinions delivered more than a passing remark, and was evidently thrown into it as a mere subterfuge upon which to claim the benefit of federal jurisdiction.

It is to be seriously regretted that the decree of a court of so high standing, in a suit of such magnitude and importance, that was tried with ability, and decided with great care and painstaking, should hang upon so slender a thread for its authority. The complainant in the suit was anxious no doubt to have it tried in the federal court, and it is more than probable that the defendants therein willingly consented to it. Parties may agree to an arbitration of their differences, but they cannot clothe a court with power to hear and determine a case. The law must invest that authority. The Constitution of the United States delegates to it certain judicial power. It extends to all cases, in law and in equity, arising under the Constitution, the laws of the United States, and treaties made under their authority, to controversies between citizens of different States, and to a few other cases, which need not be mentioned. The United States court must have acquired jurisdiction over the suit referred to, under an act of Congress adopted to carry out the two provisions of the Constitution above set out; and the extent of authority of such act must be measured by the power delegated by the said provisions. The former may be co-extensive with the latter, but cannot exceed it. Of course it will not be claimed that the controversy was between citizens of different States, in view of the statement referred to in the bill. It must have been a case "arising under the laws of the United States." And how could it be regarded

as such a case when the right of Dowell to a recovery in the suit did not depend upon any such law.    Judge Deady, in *Dowell* v. *Griswold*, 5 Sawy. 43, very properly observes, that "a case does not arise under such a law within the scope of that jurisdiction, unless the very right of the party springs out of, or has its origin in such law."    And this is but a reiteration in effect of the language of that profound jurist, Chief Justice Marshall, whose decisions long ago established the land-marks in the law of construction of the jurisdiction of the federal courts, under the Constitution of the United States.    In *Cohens* v. *Virginia*, 6 Wheat. 379, he said that a case "may truly be said to arise under the Constitution, or a law of the United States, whenever its correct decision depends upon the construction of either."    And in *Osborne* v. *Bank of the United States*, 9 Wheat. 882, said inferentially, that it would be a sufficient foundation for jurisdiction, "that the title or right set up by the party may be defeated by one construction of the Constitution or law of the United States, and sustained by the opposite construction."

How Dowell's right to have the deeds referred to set aside, and the land conveyed thereby sold, and the proceeds applied in payment of the two judgments, was affected by any construction of any act of Congress, might be explained by metaphysical subtleties, but no ordinary logic can demonstrate it.    What difference could it have made to him whether the revenue stamps upon the deeds were sufficient or not, or any revenue stamps were on them at all.    It did not enlarge his rights by not being there, or lessen them by being there, nor *vice versa*.    If their not being on would have rendered the deeds void, that would not have authorized Dowell to sequester the lands, nor their being on, and canceled with due formality, have prevented him from obtaining the relief sought.    No deformity of the deeds could affect the merits of the controversy between Dowell and the Applegates.    The gravamen of the suit was the alleged fraudulent transfer of the lands, and consequent effect upon Dowell's rights; and the allegation of fraud upon the revenue laws of the United States, by not affixing sufficient stamps upon the deeds, was a flimsy pretext for bringing the suit in the

United States court, or for. transferring it to that court from the State court. It would have been more honest to have brought it there, or have transferred it there as a matter of course, and just as legitimate. It was a fraud upon a law adopted as a part of the system of our government, and such practices should be discountenanced.

As I view the matter personally, the said decree of the United States court has not a prop of inherent support upon which to stand; that, in fact, it was *coram non judice.* Such decrees, however, possess an immunity from collateral attack, which public policy requires to be maintained. The court that rendered it, although a creature of statute, having only defined powers, stands upon the footing of a court of superior jurisdiction; and if the record were silent as to its having acquired jurisdiction in the case, it would readily be presumed that it had jurisdiction. When jurisdiction is assumed by a court of superior jurisdiction, it will be presumed, in a collateral proceeding, that it exercised it rightfully. Nor can such presumption be overcome by proof *de hors* the record. The only mode in which its jurisdiction can be questioned in such a case is by appeal or writ of error. But the difficulty here is that the record is not silent as to the existence of the conditions necessary to confer jurisdiction upon the court; it speaks; says the parties were all citizens of the State of Oregon, and that the subject-matter of the suit was an affair purely of local concern. It shows some facts, it is true, from which it might be inferred that the United States was defrauded of revenue, and which are connected with the transactions complained of, but they evidently had no bearing on the case — could not possibly affect the merits of it. I feel that the decree ought to be sustained if it can be consistently with the principles of law, but it certainly has a shaky foundation upon which to stand. It is an unfortunate circumstance, as I regard it, that the United States court attempted to take jurisdiction of the case. It is highly important that the line of demarkation between State and federal jurisdiction be strictly observed. A stride across the boundary, from either side, necessarily must result perniciously, and prudence

dictates that it is far better to yield disputed ground, than occasion a collision.

Whether the said decree is vulnerable to collateral attack or not, we do not, for the reasons before suggested, undertake to decide, but under the view taken of the first of the two questions before mentioned, the decree appealed from herein must be reversed, and I suppose under said Act of 1885 the case will have to be remanded for a new trial. The act will bear that construction, and was evidently intended to place suits in equity when tried by the court upon the same footing of actions at law, and subject them to the same rules of practice.